EQUAL EMPLOYMENT OPPORTUNI-
TY COMMISSION, Plaintiff-Appellant,

v.

MISSISSIPPI COLLEGE,
Defendant-Appellee.

No. 78–3123.

United States Court of Appeals,
Fifth Circuit.

Sept. 26, 1980.

Rehearing Denied Nov. 12, 1980.

James M. Boone, Baton Rouge, La., amicus curiae for plaintiff-appellant.

Jolly, Miller & Milan, E. Grady Jolly, Judith J. Johnson, Jackson, Miss., for defendant-appellee.

James T. McCafferty, III, Charles R. Davis, Jackson, Miss., amicus curiae for Miss. Baptist Convention Board.

Bruce R. Hopkins, Washington, D. C., amicus curiae for Christian College Coalition.

Peyton S. Irby, Jr., Jackson, Miss., amicus curiae for William Carey Col. & Am. Assoc. of Presidents of Independent Colleges and Universities.

Walter E. Carson, Washington, D. C., amicus curiae for Seventh-day Adventist Church.

Before MORGAN, CHARLES CLARK, and TATE, Circuit Judges.

CHARLES CLARK, Circuit Judge:

The Equal Employment Opportunity Commission [EEOC] appeals the district court's denial of its petition seeking enforcement of a subpoena issued in connection with its investigation of a charge of discrimination filed against Mississippi College [College]. At issue is a significant interplay between the effective enforcement of Title VII and the religious protections of the first amendment. We vacate the judgment appealed from and remand the action to the district court.

## I. FACTS

### A. The College

Mississippi College is a four-year coeducational liberal arts institution located in Clinton, Mississippi. The College is owned and operated by the Mississippi Baptist Convention [Convention], an organization composed of Southern Baptist churches in Mississippi.

Vincent J. Blackwood, E.E.O.C., Washington, D. C., for plaintiff-appellant.

Edward McGlynn Gaffney, Jr., Associate Director, Notre Dame Law School, Notre Dame, Ind., amicus curiae for Center for Constitutional Studies.

The Convention conceives of education as an integral part of its Christian mission. It acquired the College in 1850 and has operated it to the present day to fulfill that mission by providing educational enrichment in a Christian atmosphere. As part of its policy, Mississippi College seeks to assure that faculty and administrative officers are committed to the principle that "the best preparation for life is a program of cultural and human studies permeated by the Christian ideal, as evidenced by the tenets, practices and customs of the Mississippi Baptist Convention and in keeping with the principles and scriptures of the Bible." In accordance with this purpose, the College has a written policy of preferring active members of Baptist churches in hiring.[1] The evidence the College presented to the district court indicates that approximately ninety-five percent of the college's full-time faculty members are Baptists. The evidence also shows that eighty-eight percent of the College's students are Baptists. The undergraduate curriculum for all students, regardless of major, includes two courses in which the Bible is studied, and all students are required to attend chapel meetings held twice weekly. The College's facilities include prayer rooms available for use by the students and the College employs a full-time director of Christian activities. Because no woman has been ordained as a minister in a Southern Baptist church in Mississippi, the College hires only males to teach courses concerning the Bible.

## B. The Charging Party

Dr. Patricia Summers, the charging party, obtained part-time employment with the College as an assistant professor in the psychology department for the 1975–76 school year. While employed by the College, Summers learned of a vacancy in the full-time faculty of the department of educational psychology created by the departure of Raymond Case, an experimental psychologist. She expressed her desire both orally and in writing to be considered for the position, but she was not interviewed by College officials. Instead, the College hired William Bailey to fill the vacant position. When Summers inquired why she had not been considered for the vacancy, the Vice President of Academic Affairs informed her that the College sought someone with a background in experimental psychology.

In May 1976, Summers filed a charge of discrimination with the EEOC, alleging that Mississippi College had discriminated against her on the basis of sex in hiring someone to fill the vacant full-time position in the psychology department. She later amended her charge to include the additional allegations that the College discriminated against women as a class with respect to job classifications, promotions, recruitment,

---

1. The "Handbook for Members of the Faculty and Staff" prepared by the College, which purports to outline some of its policies and procedures, provides:

    In accordance with the purpose of the institution and its responsibility to its sponsoring denomination, the Mississippi Baptist Convention, Mississippi College seeks faculty and administrative personnel who are committed Christians and whose Christian principles are exemplified in daily living. In filling vacancies, consideration is given to members of evangelical Christian denominations, with the understanding that first preference will be given in each case to active members of Baptist churches, provided that academic and professional standards are met.

    Each vacancy and each applicant will be evaluated individually; in this way, Mississippi College through the years has been able to secure the services of some outstanding Christians of other denominations who have been exemplary in their devotion to the ideals of the College. However, the selection of non-Baptists to fill certain specific positions when no equally qualified Baptist is available does not indicate a departure from the continuing purpose of the institution to seek first for committed Baptists and, when appropriately qualified Baptists are not available, to accept committed evangelical Christians whose beliefs and practices are compatible with those of the College's parent denomination.

    The Baptist preference policy was originally adopted by the Board of Trustees in 1923, who by unanimous vote enacted a policy "of selecting as teachers in the college members of the Baptist Church, except in such cases where educational standards could not be maintained."

and pay and that it discriminated on the basis of race in recruiting and hiring.[2]

The evidence before the district court demonstrates that Summers had received a doctoral degree in education from the University of Virginia with a major in counseling and had engaged in post-doctoral studies at Harvard University and other nationally recognized schools. In an affidavit filed with the court, Summers averred that she previously had taught experimental psychology. The President of Mississippi College, Dr. Lewis Nobles, stated both in an affidavit filed with the EEOC and in his testimony before the district court that the College sought to fill the vacancy with an experimental psychologist, that Bailey had been trained in this field, and that Summers' experience was in clinical psychology. Nobles also stated that an additional factor in the College's selection of Bailey was that he was a Baptist, while Summers was not. Although Summers had been baptized in the Baptist faith while a child, she joined the Presbyterian church, the faith of her husband, when she married in 1970.

Although the College did not hire Summers to fill the vacant full-time position, it did offer to renew her part-time contract for the 1976–77 school year at an increased salary. In offering to renew her contract

the College did not indicate that it had any objections to her religious views.

### C. The Subpoena Enforcement Proceedings

The College refused to comply voluntarily with the EEOC's request for information that the Commission considered necessary to investigate Summers' charge. The EEOC issued a "SUBPOENA AD TESTIFICANDUM/DUCES TECUM," seeking information concerning: (1) the characteristics of each member of the College's faculty and administration, including race, sex, religion, job classification, and pay; (2) sources from which the College recruited faculty members; (3) any studies of faculty pay for the 1975–76 year; (4) all promotions of members of the faculty or administration for the 1975–76 and 1976–77 school years; (5) the employment records of Summers and Bailey; (6) all employment applications for the years 1975–76 and 1976–77; and (7) the most recent EEO–6 report filed by the College.[3] The College responded to the subpoena by filing a petition with the EEOC seeking revocation of the subpoena. The EEOC denied the College's petition. The College still declined to comply with the subpoena and the EEOC brought this action in the district court seeking enforcement of the subpoena under § 710 of Title VII, 42

**2.** In her amended charge, Summers complained of the following actions by the College:

The above named employer has unlawfully discriminated against me by denying me a full time position because of my sex (female). The above named employer also discriminates against females as a class with respect to segregated job classifications, failure to promote, failure to recruit, and pay. Further, the above named employer has discriminated on the basis of race by failing to recruit and hire Black faculty members.

**3.** Specifically, the subpoena directed Dr. Nobles to appear before the district counsel for the EEOC and to produce the documents described as follows:

    1. A list of all staff (faculty and administration) showing for each person:
      A. Name
      B. Race
      C. Sex
      D. Religion
      E. Job classification

      F. Department
      G. Pay
      H. Date of hire
      I. Date of entry into present position
      J. Highest degree attained.

    2. A list of all sources from which faculty members have been recruited for the 1975–76 and 1976–77 academic years.

    3. A copy of any studies conducted by Respondent of its patterns of faculty pay for the 1975–76 academic year.

    4. A list of all faculty and administrative promotions for the 1975–76 and 1976–77 academic years giving the name, sex, job left, job entered, and a date of charge for each person promoted during that period.

    5. Copies of the employment records of Patricia Sumners and William Bailey.

    6. Access to all applications for employment in faculty and administrative positions for the 1975–76 and 1976–77 academic years.

    7. A copy of the most recent EEO–6 report filed by Respondent.

U.S.C. § 2000e–9.[4]  After a hearing on the merits, the district court denied enforcement of the petition.  *EEOC v. Mississippi College*, 451 F.Supp. 564 (S.D.Miss.1978).

The district court found that the College was a religious educational institution, that by written policy the College accorded a preference in hiring to Baptists except where necessary to maintain academic standards, that Summers was Presbyterian, and that the male whom the College hired for the position sought by the charging party was Baptist.  After stating that the EEOC's investigation of Summers' charge did not involve any question of race discrimination, the district court concluded (1) that under § 702 of Title VII[5] the EEOC could not investigate Summers' claim of employment discrimination except to determine whether the College's allegation that it hired Bailey because of his religion was true; (2) that because an investigation of the College's employment practices by the EEOC would result in excessive entanglement of the government in church affairs, the application of Title VII to a religious educational institution violated the establishment clause of the first amendment; (3) that because an investigation of the College's employment practices by the EEOC potentially would inhibit the College's practice of preferring Baptists in hiring, the EEOC's exercise of jurisdiction over the College violated the free exercise clause of the first amendment; and (4) that the College's selection of faculty members involved matters of church administration, that are exempt from the application of Title VII under this court's decision in *McClure v. Salvation Army*, 460 F.2d 553 (5th Cir.), *cert. denied*, 409 U.S. 896, 93 S.Ct. 132, 34 L.Ed.2d 153 (1972).

On this appeal the EEOC contends that the district court erred in denying its petition for enforcement.  First, it asserts that Summers, although white, can assert a charge of race discrimination against the College because she has standing to assert discrimination that affects her "working environment."  Second, it argues that § 702 does not exempt race or sex discrimination by a religious education institution from the scope of Title VII.  Third, it maintains that its investigation of the College's hiring practices violates neither the establishment clause nor the free exercise clause of the first amendment.

## II.  SUMMERS' STANDING TO ASSERT A CHARGE OF RACIAL DISCRIMINATION

The district court concluded that the EEOC's subpoena enforcement action did not involve any question of racial discrimination by the College.  *EEOC v. Mississippi College*, 451 F.Supp. at 565.  The EEOC argues that this conclusion was erroneous because Summers included in her amended charge allegations that the College discriminated against blacks in the recruitment and hiring of faculty members.  The EEOC asserts that Summers, a white female, has standing to charge the College with discrimination against others that affected her "working environment."

### A.  Can a Person Charge Discrimination Against a Group of Which he is not a Member?

Section 703 of Title VII proscribes those employment practices utilized by an em-

4.  Section 710 of Title VII grants to the EEOC, for the purposes of any hearing or investigation it conducts, the same investigatory powers exercised by the National Labor Relations Board under 29 U.S.C. § 161.  Thus § 710 empowers the district court within whose jurisdiction either the EEOC is conducting its inquiry or the person resides against whom enforcement of the subpoena is sought to order any person who refuses to obey a subpoena issued by the EEOC to appear before the EEOC, to produce evidence if so ordered, or to give testimony concerning the matter under investigation.

Any failure to obey is punishable as a contempt of court.  *See* 29 U.S.C. § 161.

5.  Section 702 of Title VII, 42 U.S.C. § 2000e–1, reads:

This subchapter shall not apply to  .  .  .  a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

ployer that discriminate against any individual "because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2. Section 706(b) of Title VII permits "a person claiming to be aggrieved, or . . . a member of the Commission" to file with the EEOC a charge alleging an unlawful employment practice under Title VII. *See id.* § 2000e–5(b).

In *Rogers v. EEOC*, 454 F.2d 234 (5th Cir. 1971), *cert. denied*, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972), Judge Goldberg, without the concurrence of either of the two other panel members, concluded that an employee could charge her employer under § 703 with discrimination that, although not directed towards her, had the effect of creating a "working environment heavily charged with discrimination."[6] Judge Goldberg observed that § 703(a)(1) of Title VII prohibits discrimination with respect with "compensation, terms, conditions or privileges of employment" and reasoned that Congress intended to encompass within Title VII subtle discriminatory practices that, while not directed toward the charging employee, affected the employee by creating a working environment "polluted" with discrimination. *Id.* at 237–39.

The College relies on *Stroud v. Delta Air Lines, Inc.*, 544 F.2d 892 (5th Cir.), *cert. denied*, 434 U.S. 844, 98 S.Ct. 146, 54 L.Ed.2d 110 (1977). In *Stroud*, a panel of this court, after noting in dictum that Delta Air Line's policy of hiring only female flight attendants violated § 703, stated that the "plaintiff [a female former stewardess] is not a person who may assert the rights of prospective male flight attendants who would complain of this illegality." *Id.* at 893. We interpret *Stroud* to hold that a Title VII plaintiff may assert only his own right to be free from discrimination that has an effect upon him and may not assert the rights of others to be free from discrimination.

*Trafficante v. Metropolitan Life Insurance Co.*, 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972), will not permit the language in *Stroud* to bar every charge of discriminatory employment practices directed against a group of which the charging party is not a member. In *Trafficante*, the Supreme Court construed the meaning of the term "person aggrieved" contained in § 810(a) of the Fair Housing Act, 42 U.S.C. § 3610(a). The Court reasoned that by defining "aggrieved person" in § 810(a) to include "[a]ny person who claims to have been injured by a discriminatory housing practice," Congress demonstrated an intent to confer standing to the fullest extent permitted by Article III of the United States Constitution. Because the black and white tenants of an apartment complex alleged to have discriminated against nonwhites met the requirement of *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), by alleging injury in fact in the form of "the loss of important benefits from interracial associations," the Court found that they had standing to challenge the alleged discrimination against nonwhites by filing complaints under § 810 of the Fair Housing Act. 409 U.S. at 210, 93 S.Ct. at 367, 34 L.Ed.2d at 415.

We agree with other circuits that have held that the strong similarities between the language, design, and purposes of Title VII and the Fair Housing Act require that the phrase "a person claiming to be aggrieved" in § 706 of Title VII must be construed in the same manner that *Trafficante* construed the term "aggrieved person" in § 810 of the Fair Housing Act. *See, EEOC v. Bailey Co.*, 563 F.2d 439, 450–54 (6th Cir. 1977), *cert. denied*, 435 U.S. 915, 98 S.Ct. 1468, 55 L.Ed.2d 506 (1978); *Waters v. Heublein*, 547 F.2d 466, 469–70 (9th Cir. 1976), *cert. denied*, 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1100 (1977).[7]

---

**6.** Judge Godbold concurred on a different ground. Judge Roney dissented.

**7.** In making its determination under the Fair Housing Act, the Supreme Court in *Trafficante* explicitly relied upon the construction by the

Third Circuit of similar language embodied in § 706 of Title VII, 42 U.S.C. § 2000e–5, in *Hackett v. McGuire Brothers*, 445 F.2d 442 (3d Cir. 1971). In *Hackett* the Third Circuit held that the words "by a person claiming to be aggrieved" contained in § 706 showed "a con-

■ We conclude that § 706 of Title VII permits Summers to file a charge asserting that Mississippi College discriminates against blacks on the basis of race in recruitment and hiring.[8] Our decision today does not allow Summers to assert the rights of others. We hold no more than that, provided she meets the standing requirements imposed by Article III, Summers may charge a violation of her own personal right to work in an environment unaffected by racial discrimination.

## B. Sufficiency of Summers' Charge

Two problems inhere in Summers' attempt to charge racial discrimination by the College. First, her charge does not identify how she has been injured by the alleged racial discrimination. Second, her charge of racial discrimination may not have been timely filed.

■ In her amended charge, Summers asserted that the College "has discriminated on the basis of race by failing to recruit and hire Black faculty members." As a general rule, charges filed with the EEOC must be liberally construed because charging parties usually are unfamiliar with the technicalities of formal pleadings and are not assisted by an attorney. *See Tillman v. City of Boaz*, 548 F.2d 592, 596 (5th Cir. 1977); *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 462–63 (5th Cir. 1970). Section 706(b) of Title VII, 42 U.S.C. § 2000e–5(b), requires that charges be filed in writing under oath and that they "contain such information and be in such form as the Commission requires." The EEOC's regulations establish very minimal requirements for the sufficiency of charges and allow technical defects or omissions to be cured by amendment:

a charge is sufficient when the Commission receives from the person making the charge a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of. A charge may be amended to cure technical defects or omissions, including failure to verify the charge, or to clarify and amplify allegations made therein. Such amendments and amendments alleging additional acts which constitute unlawful employment practices related to or growing out of the subject matter of the original charge will relate back to the date the charge was first received. . . .

29 C.F.R. § 1601.12(b) (1979). We conclude that, by identifying in a general fashion the parties involved and the action or practices complained of, Summers' amended charge sufficiently stated a charge of racial discrimination. Although Summers' amended charge fails to disclose the specific injury that she suffered because of the College's alleged racially discriminatory practices, we accept the argument of the EEOC that Summers could claim that the discrimination deprived her of the benefits arising from association with racial minorities in a working environment unaffected by discrimination.

The record before us on this appeal prevents us from determining whether Summers' charge of racial discrimination was timely. Summers' original charge filed with the EEOC alleged only that the College had discriminated against her on the basis of her sex in denying her a full-time faculty position. The issue of racial discrimination did not arise until Summers filed the amended charge on November 30, 1976. Because her allegations of racial discrimination do not relate to or grow out of the allegations of sex discrimination advanced in the original charge, that aspect of

---

gressional intention to define standing as broadly as is permitted by Article III of the Constitution." *Id.* at 446.

8. We decide only the issue before us of whether a white employee can charge her employer with discriminating against blacks in violation of Title VII. We expressly pretermit the question of whether any form of discrimination oth-

er than racial discrimination can be charged by a person who is not a member of the group against whom the discrimination is directed. *See EEOC v. Bailey Co.*, 563 F.2d at 454 n.9. We likewise pretermit and intimate no opinion concerning Summers' adequacy as a class representative for any blacks against whom the College may have discriminated.

the amended charge does not relate back to the time of filing of her original charge. The charge of racial discrimination is therefore time barred unless it could have been timely filed on November 30, 1976, as a separate charge.

While the record does not establish the date on which her employment with the College terminated, it suggests that she left the College's employ following the 1975–76 school year. Thus the charge of racial discrimination by the College may be barred, if it was not filed within 180 days of the termination of her employment with the College. *See* 42 U.S.C. § 2000e–5(e).[9]

Summers' amended charge characterizes the discrimination as "continuing." However, under the construction of her charge of racial discrimination urged by the EEOC and adopted by us on appeal, the unlawful practice ceased with respect to Summers once she left the working environment. *See United Air Lines, Inc. v. Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977). We leave the determination of the timeliness of her charge of racial discrimination to be determined by the district court on remand.

### III. SECTION 702 OF TITLE VII

Section 702 of Title VII exempts from the application of Title VII religious educational institutions "with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such . . . educational institution . . . of its activities." 42 U.S.C. § 2000e–1.

The EEOC contends that § 702 only exempts from the coverage of Title VII dis-

crimination based upon religion, not discrimination predicated upon race, color, sex, or national origin. It argues that the College's mere assertion that it declined to hire Summers because of her religion should not prevent it from investigating to determine if the College used Summers' religion as a pretext for some other form of discrimination. The College asserts that its hiring decision falls squarely within the statutory exemption created by § 702.

This court previously rejected the argument that the exemption provided by § 702 applies to all of the actions of a religious organization taken with respect to an employee whose work was connected with its "religious activities." *See McClure v. Salvation Army,* 460 F.2d 553 (5th Cir.), *cert. denied,* 409 U.S. 896, 93 S.Ct. 132, 34 L.Ed.2d 153 (1972). In *McClure* we restricted the application of that exemption to a religious organization's discrimination in employment against an individual on the basis of religion, stating:

> The language and the legislative history of § 702 compel the conclusion that Congress did not intend that a religious organization be exempted from liability for discriminating against its employees on the basis of race, color, sex or national origin with respect to their compensation, terms, conditions or privileges of employment.

*Id.* at 558.

■ The College argues first that once it showed (1) an established policy of preferring Baptists in its hiring decisions, (2) that the individual hired for the position was Baptist, and (3) that the charging party was

---

9. 42 U.S.C. § 2000e–5(e) reads:

(e) A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred and notice of the charge (including the date, place and circumstances of the alleged unlawful employment practice) shall be served upon the person against whom such charge is made within ten days thereafter, except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agen-

cy with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier, and a copy of such charge shall be filed by the Commission with the State or local agency.

not a Baptist, § 702 prevented the EEOC from investigating further the charge of discrimination. *McClure* did not address the EEOC's authority to investigate an individual charge of race or sex discrimination asserted against a religious institution that presents evidence showing that it made the challenged employment decision on the basis of an individual's religion. We conclude that if a religious institution of the kind described in § 702 presents convincing evidence that the challenged employment practice resulted from discrimination on the basis of religion, § 702 deprives the EEOC of jurisdiction to investigate further to determine whether the religious discrimination was a pretext for some other form of discrimination. This interpretation of § 702 is required to avoid the conflicts that would result between the rights guaranteed by the religion clauses of the first amendment and the EEOC's exercise of jurisdiction over religious educational institutions. *See N.L. R.B. v. Catholic Bishop of Chicago*, 440 U.S. 490, 500–02, 99 S.Ct. 1313, 1319–20, 59 L.Ed.2d 533, 541–42 (1979); *McClure v. Salvation Army*, 460 F.2d at 558–60.

The College argues second, and more broadly, that the employment relationship between a religious educational institution and its faculty is exempt from Title VII. It relies on *McClure's* holding that the relationship between a church and its ministers was not intended by Congress to be covered by Title VII. The College's reliance on *McClure* as support for this argument is misplaced.

In *McClure* this court expressly restricted its decision to the context of the church-minister relationship. Id. at 555. We concluded that matters touching the relationship between a church and its ministers, including the selection of a minister, determination of salary, and assignment of duties and location, are "matters of church administration and government and thus, purely of ecclesiastical cognizance." *Id.* at 559–60. The facts distinguish this case from *McClure*. The College is not a church. The College's faculty and staff do not function as ministers. The faculty members are not intermediaries between a church and its congregation. They neither attend to the religious needs of the faithful nor instruct students in the whole of religious doctrine. That faculty members are expected to serve as exemplars of practicing Christians does not serve to make the terms and conditions of their employment matters of church administration and thus purely of ecclesiastical concern. The employment relationship between Mississippi College and its faculty and staff is one intended by Congress to be regulated by Title VII.

Because the College is not a church and its faculty members are not ministers, *McClure's* construction of Title VII does not bar the EEOC in the instant case from investigating Summers' allegations that the college engages in class discrimination against women and blacks.[10] However, as pointed out above, § 702 may bar investigation of her individual claim. The district court did not make clear whether the individual employment decision complained of by Summers was based on the applicant's

10. The College has asserted both before this court and before the district court that its desire to employ Southern Baptists whenever possible to facilitate the carrying out of its religious mission has resulted in its adoption of several recruiting and employment practices that tend to have a disparate impact upon women and blacks. The College contends, for example, that it recruits faculty members through the Association of Baptist Colleges, the member colleges of which have predominantly white student bodies. To the extent that this employment practice is based upon religious discrimination, § 702 exempts it from the application of Title VII. However, any choice by the College to recruit only among Baptist colleges that are predominantly white as opposed to all Baptist colleges is not protected by § 702 and could be investigated by the EEOC. Also, § 702 does not prevent the EEOC from investigating whether the College discriminates against any blacks who may apply from the schools at which it does recruit. The determination of which of the College's employment practices are based upon religious discrimination and therefore exempt under § 702 can best be made by the district court on remand. On remand the College should be granted a further opportunity to present evidence demonstrating which parts of the information sought concern practices based upon religious discrimination.

religion.[11] Thus, we cannot determine whether the exemption of § 702 applies. If the district court determines on remand that the College applied its policy of preferring Baptists over non-Baptists in granting the faculty position to Bailey rather than Summers, then § 702 exempts that decision from the application of Title VII and would preclude any investigation by the EEOC to determine whether the College used the preference policy as a guise to hide some other form of discrimination. On the other hand, should the evidence disclose only that the College's preference policy could have been applied, but in fact it was not considered by the College in determining which applicant to hire, § 702 does not bar the EEOC's investigation of Summers' individual sex discrimination claim.

## IV. FIRST AMENDMENT QUESTIONS

The EEOC contends that the district court erred in concluding that application of Title VII to a religious educational institution would foster the excessive government entanglement with religion prohibited by the establishment clause and would impermissibly burden the institution's practice of its religious beliefs in violation of the free exercise clause.

### A. Establishment Clause

The establishment clause of the first amendment prohibits Congress from enacting any law "respecting an establishment of religion." U.S.Const. Amend. I. In determining whether a congressional enactment violates the establishment clause, the Supreme Court has examined three principal criteria: (1) whether the statute has a secular legislative purpose, (2) whether the principal or primary effect of the statute is neither to advance nor to inhibit religion, and (3) whether the statute fosters "an excessive government entanglement with religion." *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745, 752 (1971). *See also Committee for Public Education and Religious Liberty v. Regan*, 444 U.S. 646, 654, 100 S.Ct. 840, 846, 63 L.Ed.2d 94, 102 (1980); *Roemer v. Maryland Public Works Bd.*, 426 U.S. 736, 748, 96 S.Ct. 2337, 2348, 49 L.Ed.2d 179, 188 (1976). The College does not contend that Title VII has no secular legislative purpose or that it inhibits or advances religion as its primary effect. We therefore focus our inquiry upon the third criteria: whether the statute fosters an excessive entanglement with religion.

In *Lemon* the Court evaluated three factors in determining whether government entanglement with religion is excessive:

the character and purposes of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and the religious authority.

403 U.S. at 614–15, 91 S.Ct. at 2112, 29 L.Ed.2d at 756. *See also Roemer v. Board of Public Works of Maryland*, 426 U.S. at 761–765, 96 S.Ct. at 2352–53, 49 L.Ed.2d at

---

11. In its original opinion, the district court stated:

the petitioner [EEOC] has asserted that the respondent [Mississippi College] failed to hire Dr. Summers *solely because of the fact that she is a female. That contention is not denied,* but the college contends that it is a privately owned and operated religious institution and that its decision may not be inquired into or changed by any disagreement with such conclusions; and least of all that the petitioner simply has no statutory authority to issue a subpoena and to require conformity thereto under any guise or pretext. *EEOC v. Mississippi College*, 451 F.Supp. at 565 (emphasis added). In the "Findings of Fact and Conclusions of Law" that the district court issued subsequent to its opinion, it found:

Mississippi College has a written policy of preferring applicants of the Baptist Faith except when it becomes necessary in a particular instance to hire a non-Baptist in order to maintain academic standards in a given discipline. It is undisputed that the male who was hired for the position in question is a Baptist while the charging party is Presbyterian.

This finding does not explicitly conclude that the College applied its Baptist preference policy in determining not to hire Summers, even though it indicates that the decision could have been based at least in part on Summers' religion.

196–198 (1976). Although the Supreme Court generally has construed the establishment clause in the context of governmental action that benefited a religious activity, see *Committee for Public Education and Religious Liberty v. Regan,* 444 U.S. 646, 100 S.Ct. 840, 63 L.Ed.2d 94 (1980); *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), it is now clear that the establishment clause is implicated by a statute that potentially burdens religious activities. *See N.L.R.B. v. Catholic Bishop of Chicago,* 440 U.S. 490, 500–502, 99 S.Ct. 1313, 1319–20, 59 L.Ed.2d 533, 541–542 (1979). The three-prong test employed in *Lemon* to determine whether government entanglement is excessive applies with equal force to such cases.

The evidence presented to the district court makes it readily apparent that the character and purposes of the College are pervasively sectarian. The purpose of the College is to provide a college education in an atmosphere saturated with Christian ideals. The College is formally affiliated with the Mississippi Baptist Convention. Indeed, the College exists primarily to serve the evangelical mission of the Convention. The Convention selects the Board of Trustees that exercises effective control over the College.

The nature of the burden that might be imposed upon the College by the application of Title VII to it is largely hypothetical at this stage of the proceedings. The information requested by the EEOC's subpoena does not clearly implicate any religious practices of the College. The College's primary concern is that the EEOC's investigation will not cease should it comply with the subpoena, but instead will intrude further into its operations. The College worries that the EEOC will seek to require it to alter the employment practices by which it seeks to ensure that its faculty members are suitable examples of the Christian ideal advocated by the Southern Baptist faith. These hypothetical concerns are of limited validity. As noted previously, the exemption granted to religious institutions by § 702 of Title VII must be construed broadly to exclude from the scope of the act any employment decision made by a religious institution on the basis of religious discrimination. This construction of § 702 largely allays the College's primary concern that it will be unable to continue its policy of preferring Baptists in hiring. The only practice brought to the attention of the district court that is clearly predicated upon religious beliefs that might not be protected by the exemption of § 702 is the College's policy of hiring only men to teach courses in religion.[12] The bare potential that Title VII would affect this practice does not warrant precluding the application of Title VII to the College. Before the EEOC could require the College to alter that practice, the College would have an opportunity to litigate in a federal forum whether § 702 exempts or the first amendment protects that particular practice. We thus determine that, in the factual context before us, the application of Title VII to the College could have only a minimal impact upon the College's religion based practices.

The relationship between the federal government and the College that results from the application of Title VII does have limits both in scope and effect. It is true that the subpoena issued to the College by the EEOC presages a wide ranging investigation into many aspects of the College's hiring practices. Furthermore, should the EEOC conclude that cause exists to believe that the College discriminates on the basis of sex or race, the College in all likelihood would be subjected to a court action if it did not voluntarily agree to alter its actions. The College would, however, be entitled to a de novo determination of whether its practices violate Title VII. In that action the College could reassert the protection of the first amendment prior to being ordered to amend its practices. If the challenged

---

12. In his testimony before the district court Dr. Nobles explained that the practice of not hiring women to teach religion courses was based upon Bible scriptures indicating that pastors and deacons should be men. He testified that to his knowledge no member church of the Mississippi Baptist Convention had an ordained woman preacher.

employment practices survived the scrutiny of the district court, the EEOC could not attack again those particular practices absent some change in circumstances.

■ Although the College is a pervasively sectarian institution, the minimal burden imposed upon its religious practices by the application of Title VII and the limited nature of the resulting relationship between the federal government and the College cause us to find that application of the statute would not foster excessive government entanglement with religion. Employment practices based upon religious discrimination are exempt under § 702 from the coverage of Title VII and the College could not be required to alter any of its other employment practices until it exercised its opportunity to justify those practices on first amendment grounds before a federal district court. Because no religious tenets advocated by the College or the Mississippi Baptist Convention involve discrimination on the basis of race or sex, an investigation by the EEOC will only minimally intrude upon any of the College's or Convention's religious beliefs. No ongoing interference with the College's religious practices will result from an EEOC investigation of the charge filed by Summers. Therefore, we conclude that imposing the requirements of Title VII upon the College does not violate the establishment clause of the first amendment.

### B. The Free Exercise Clause

The free exercise clause of the first amendment proscribes any congressional legislation "prohibiting the free exercise" of religion. U.S.Const. Amend. I.

In determining whether a statutory enactment violates the free exercise of a sincerely held religious belief, the Supreme Court has examined (1) the magnitude of the statute's impact upon the exercise of the religious belief, (2) the existence of a compelling state interest justifying the burden imposed upon the exercise of the religious belief, and (3) the extent to which

recognition of an exemption from the statute would impede the objectives sought to be advanced by the state. *See Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963).

As discussed previously, the impact of Title VII upon the exercise of the religious belief is limited in scope and degree. Section 702 excludes from the scope of Title VII those employment practices of the College that discriminate on the basis of religion. We acknowledge that, except for those practices that fall outside of Title VII, the impact of Title VII on the College could be profound. To the extent that the College's practices foster sexual or racial discrimination, the EEOC, if unable to persuade the College to alter them voluntarily, could seek a court order compelling their modification, imposing injunctive restraints upon the College's freedom to make employment decisions, and awarding monetary relief to those persons aggrieved by the prohibited acts. However, the relevant inquiry is not the impact of the statute upon the institution, but the impact of the statute upon the institution's exercise of its sincerely held religious beliefs. The fact that those of the College's employment practices subject to Title VII do not embody religious beliefs or practices [13] protects the College from any real threat of undermining its religious purpose of fulfilling the evangelical role of the Mississippi Baptist Convention, and allows us to conclude that the impact of Title VII on the free exercise of religious beliefs is minimal.

Second, the government has a compelling interest in eradicating discrimination in all forms. *See Brown v. Dade Christian Schools, Inc.,* 556 F.2d 310, 323 (5th Cir. 1977) (en banc) (Goldberg, J., specially concurring), *cert. denied,* 434 U.S. 1063, 98 S.Ct. 1235, 55 L.Ed.2d 763 (1978). Congress manifested that interest in the enactment of Title VII and the other sections of the Civil Rights Act of 1964. The proscription upon racial discrimination in particular is

---

13. *See* text at note 12, *supra.*

mandated not only by congressional enactments but also by the thirteenth amendment. We conclude that the government's compelling interest in eradicating discrimination is sufficient to justify the minimal burden imposed upon the College's free exercise of religious beliefs that results from the application of Title VII.

Moreover, we conclude that creating an exemption from the statutory enactment greater than that provided by § 702 would seriously undermine the means chosen by Congress to combat discrimination and is not constitutionally required. Although the number of religious educational institutions is minute in comparison to the number of employers subject to Title VII, their effect upon society at large is great because of the role they play in educating society's young. If the environment in which such institutions seek to achieve their religious and educational goals reflects unlawful discrimination, those discriminatory attitudes will be perpetuated with an influential segment of society, the detrimental effect of which cannot be estimated. Because the burden placed upon the free exercise of religion by the application of Title VII to religious educational institutions is slight, because society's interest in eradicating discrimination is compelling, and because the creation of an exemption greater than that provided by § 702 would seriously undermine Congress' attempts to eliminate discrimination, we conclude the application of Title VII to educational institutions such as Mississippi College does not violate the free exercise clause of the first amendment.

## V. CONCLUSION

To summarize our holdings, we conclude that (1) Summers cannot charge the College with discriminating against blacks without establishing that she could satisfy the standing requirements of Article III of the Constitution to bring a court action against it under Title VII; (2) section 702 of Title VII, excludes from the application of the Act any employment practices of a religious educational institution that discriminate on the basis of religion regardless of whether the religious discrimination is a pretext for some other type of discrimination; (3) *McClure v. Salvation Army*, exempts from the coverage of Title VII only the relationship between a church and its minister and does not apply to the relationship between a religious educational institution and its faculty; and (4) the application of Title VII to the College violates neither the establishment clause nor the free exercise clause of the first amendment. We vacate the district court's findings of fact, its conclusions of law, and its initial opinion and remand for further proceedings consistent with this opinion. We specifically note that on remand the district court should determine whether Summers' charge of race discrimination was timely filed and should allow the parties to present further evidence demonstrating which employment practices of Mississippi College are exempt from the coverage of Title VII under § 702 as construed by this opinion. We leave for resolution by the district court on remand the question of what portions of the EEOC's subpoena should be enforced.[14]

VACATED and REMANDED.

---

14. We note that EEOC's request for a copy of the most recent EEO–6 report filed by the College should be denied since that report is already in its possession, *see EEOC v. Packard Electric Division, General Motors Corp.*, 569 F.2d 315, 318–19 (5th Cir. 1978).