659 F.2d 690
 27 Fair Empl.Prac.Cas. 10, 27 Empl. Prac.
Dec. P 32,202
UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,
Plaintiff-Appellant,
v.
T. I. M. E.-D. C. FREIGHT, INC., and the International
Brotherhood of Teamsters, Warehousemen and
Chauffers, Defendants-Appellees.
 No. 81-1168
 
 Summary Calendar.
 United States Court of Appeals,
Fifth Circuit.
 Oct. 22, 1981.
 Justine S. Lisser, E. E. O. C., Washington, D. C., for plaintiff-appellant.
 Matheson, Bieneman, Parr, Schuler & Ewald, Robert D. Schuler, Bloomfield Hills, Mich., for T. I. M. E.
 Mullinax, Wells, Mauzy & Baab, Inc., L. N. D. Wells, Jr., Dallas, Tex., for International Broth.
 Appeal from the United States District Court for the Northern District of Texas.
 Before AINSWORTH, REAVLEY and RANDALL, Circuit Judges.
 PER CURIAM:
 
 
 1
 On remand from the Supreme Court, International Brotherhood of Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), the district court heard evidence and entered a "final order" determining the rights of individual class members to relief. The EEOC appeals, challenging the district court's denial of relief to five class members and attacking a purported finding of fact. We affirm in part and reverse and remand in part.
 
 I. The Four Memphis City Drivers
 
 2
 The district court determined that four former "city drivers" at T.I.M.E.-D.C.'s Memphis terminal Charles E. Taylor, Charles D. Glover, Gerald Jacques, and Herbert Gene Kelly (the "claimants") were not entitled to relief. Taylor and Glover are black; Jacques and Kelly are white. In 1969, all four men transferred from "city" to "line" jobs.[1] The district court expressly found that all four had made application for such transfer "as of July 2, 1965, prior to that time, and subsequent to that time." It is undisputed that it was the company's policy, from 1958 until 1969, not to allow transfer from city to line jobs. It was the EEOC's theory at trial that this policy had a discriminatory purpose: to prevent blacks (who held only city jobs) from becoming line drivers.[2]
 
 
 3
 The district court did not make a finding expressly stating that it adopted the EEOC's theory. Such a finding is necessarily implied, however, by its grant of relief to Julius Glasper, a class member whose situation was similar to the four claimants in every way but one: when the company discontinued the "no-transfer" policy in 1969, Glasper declined the opportunity to transfer from his city job to a line job.[3] The district court denied relief to the other four claimants solely because they took the opportunity to transfer, stating: "Ordinarily relief would have been given to these men but, at the time of transfer to line, each agreed with T.I.M.E., as evidenced by waiver-letters in their personnel files, that their seniority date on the line roster would be as of the date of their transfer ...." (emphasis added). We think that denying relief on this ground was error.
 
 
 4
 The so-called "waiver-letters" signed by each of the four claimants provided in full: "TO WHOM IT MAY CONCERN: This is to certify I hereby understand and agree my seniority date with T.I.M.E.-D.C., Inc., as a line driver is (the date of my transfer)" (emphasis added). This statement signifies nothing more than that the employee "understood" and "agreed" that, under the applicable collective bargaining agreement, any employee who transferred from one line of work to another had seniority in that new line only as of the date of his transfer. The letter does not purport to act as a waiver or a settlement of any pre-existing claim, Title VII or otherwise, against the company. Moreover, the defendants did not take the position nor introduce any evidence at trial that the parties understood or intended the letter to operate as a waiver or settlement of any such claim.[4]
 
 
 5
 It would be ironic indeed to hold that these four drivers are barred from relief simply because the company finally gave them what they were long entitled to by removing an illegally-motivated barrier to their transfer.[5] It would be equally ironic to put these four in a worse position than Glasper because they lent credence to their allegations that they requested transfer between 1965 and 1969 by actually transferring as soon as they were given the opportunity. The district court has held, in effect, that by taking the incentive to better their positions in 1969, rather than waiting twelve years for the EEOC to vindicate their claims, they have surrendered their right to relief. In the absence of any evidence that they knew they were doing so, we cannot uphold this conclusion.
 
 
 6
 The document at issue would not suffice as proof of settlement of any claim; it follows a fortiori that it cannot suffice as proof of settlement or waiver of a Title VII claim. This court has been so rigorous in requiring a "voluntary and knowing"[6] waiver of Title VII rights that it has required proof that claimants "comprehended the rights that they were relinquishing" when they signed a "conciliation agreement" expressly waiving all Title VII rights. Cox v. Allied Chemical Corp., 538 F.2d 1094, 1098 (5th Cir. 1976). Since the document in question here cannot pass as a "waiver," it certainly cannot pass as a "voluntary and knowing" one.[7]
 
 
 7
 Title VII rights can be waived and Title VII claims can be settled. But there must be some evidence of waiver or settlement. There is none here.
 
 
 8
 In so holding, we express no criticism of the court below. That court's handling of this lengthy, massive, important case has been outstanding. We simply hold that of the hundreds of claims for relief in this case, four were denied on an improper ground.
 
 
 9
 We remand these four claims for a determination of the proper seniority dates of the claimants.
 
 II. Virgil Hardin
 
 10
 It is difficult to understand the EEOC's position concerning Virgil Hardin. Hardin was granted retroactive seniority by the district court's original decree in 1973. He held a position as a line driver in the Los Angeles terminal through 1977. In 1975, he was laid off. In 1977, Hardin was terminated, pursuant to the collective bargaining agreement, because he failed to accept any of three opportunities to return from lay-off. Thus, the EEOC cannot be complaining that Hardin was never given the relief to which he was entitled; it must be complaining that his termination was a violation of Title VII.
 
 
 11
 We doubt very much that this claim has anything to do with the "pattern and practice" of discrimination in "hiring, assignment, and promotion policies" established by the government in the liability phase of this case, see Teamsters, 431 U.S. at 329, 334-43, 97 S.Ct. at 1851, 1854-58. Even if Hardin's claim were a proper part of this case, we think that he would have the initial burden of establishing a prima facie case that he was terminated because of his race, a burden which he and the EEOC did not even attempt to satisfy at trial. But even giving Hardin, as the district court did, the benefit of the presumption of discrimination established in the pattern and practice suit,[8] the company unquestionably demonstrated a legitimate, non-discriminatory reason for his discharge: it proved that it sent him three recall letters and he failed to accept the positions offered. There was no evidence that this reason was a pretext for discrimination.[9] See Texas Department of Community Affairs v. Burdine, --- U.S. ----, 101 S.Ct. 1089, 1093-95, 67 L.Ed.2d 207 (1981) (burdens of proof).
 
 
 12
 Thus, we affirm the district court's denial of relief to Hardin.
 
 III.
 
 13
 Finally, the EEOC objects to the following paragraph in the district court's "final order":
 
 
 14
 There has been no criticism by this court, or any of the appellate courts reviewing the case, as to the good faith efforts of T.I.M.E.-D.C. to remedy the effects of past discrimination in its hiring and initial assignment practices since the original court orders in this case. The Consent Decree provided that T.I.M.E.-D.C. agreed to hire in the "ratio of at least one black or one Spanish surnamed American for each white hired or transferred," Sec. 13(b), (and) the reports on file with this court indicate that this provision of the Consent Decree has been complied with and honored.
 
 
 15
 The EEOC attacks the final portion of this statement as a "finding" that T.I.M.E.-D.C. has complied with the consent decree, a "finding" which, it says, is not supported by the evidence. We need not concern ourselves with the evidence, however, because the statement neither is nor purports to be a "finding." The company's compliance was not an issue before the district court, and this statement forms no part of the relief ordered by the court. The statement would not preclude any person who might otherwise have the right to challenge the company's compliance from doing so.
 
 
 16
 The paragraph is simply one of many preceding the decretal paragraphs of the court's order. The paragraphs that precede and follow it discuss the history of the litigation and the general equitable principles the court has followed in framing its relief. Taken in context, the paragraph is merely a commendation of the efforts T.I.M.E.-D.C. has made to remedy the effects of its past practices. We similarly commended the company in our prior opinion in this case. United States v. T.I.M.E.-D.C., 517 F.2d 299, 316 (5th Cir. 1975), vacated and remanded, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).
 
 
 17
 AFFIRMED IN PART, REVERSED AND REMANDED IN PART.
 
 
 
 [1]
 We use the terminology adopted by the Court in Teamsters, 431 U.S. at 329 n.3, 97 S.Ct. at 1852 n.3
 
 
 [2]
 Although Jacques and Kelly are white, they may be "persons aggrieved" by discrimination against blacks, provided that they can establish a personal injury. EEOC v. Mississippi College, 626 F.2d 477, 483 (5th Cir. 1980), cert. denied, --- U.S. ----, 101 S.Ct. 3143, 69 L.Ed.2d 994 (1981). The injury to Jacques and Kelly seems more substantial than that held sufficient in Mississippi College not only can each claim a violation of his "personal right to work in an environment unaffected by racial discrimination," id., but each can also claim a deprivation of the same employment opportunity denied to the black claimants
 
 
 [3]
 The district court found that Glasper spelled "Glesper" in the court's order, but compare Glasper's own spelling in his trial testimony, Tr. 394 applied for a line job in October 1965. The court also found that there was no vacancy for a job until March 29, 1966. On January 31, 1966, Glasper became a regular city driver. Therefore, the company's no-transfer policy was as applicable to him when a position became available as it was to the four claimants
 
 
 [4]
 Instead, defendants argue that the four drivers have no claim because their seniority was awarded in accord with the seniority system found by the Supreme Court to be bona fide in Teamsters, 431 U.S. at 355, 97 S.Ct. at 1865. But these drivers' Title VII claim for the company's refusal to transfer them between July 2, 1965 the date Title VII went into effect and 1969 involves no challenge to the bona fides of the seniority system. In Teamsters, the Supreme Court made clear that a finding of bona fides "does not bar the award of retroactive seniority to job applicants who seek relief from an employer's post-Act hiring discrimination." 431 U.S. at 346, 97 S.Ct. at 1860. Thus, the fact that the seniority system is bona fide is irrelevant; the question is whether the "waiver-letter" provides any ground for refusing relief for established violations of the statute
 
 
 [5]
 Not only did the company make no concession other than what the law required it to make, but in fact it attempted to extract a concession from these claimants by making them give up their company seniority along with their job seniority, in violation of the collective bargaining agreement. The claimants declined to accept the company's original offer, and waited until the offer was changed to conform to the agreement
 Defendants point out that this change in the offer came about when other city drivers accepted the company's original offer, but then won back their company seniority through the bargaining agreement's grievance procedure. Defendants make the strange argument that the claimants should be estopped because they benefitted from the grievance procedure. If the grievance award shows anything, it shows that acceptance of the company's offer was not even considered a "waiver" of the very thing the claimants are purported to have waived, i. e., any claim concerning their seniority rights under the bargaining agreement. Much less could it operate as a waiver of their Title VII rights.
 
 
 [6]
 Alexander v. Gardner-Denver Co., 415 U.S. 36, 52 n.15, 94 S.Ct. 1011, 1021 n.15, 39 L.Ed.2d 147 (1974)
 
 
 [7]
 Because it is not a "waiver," the district court's finding that it was not "the result of any discrimination or other pressure" is irrelevant
 
 
 [8]
 See Teamsters, 431 U.S. at 362, 97 S.Ct. at 1868 ("On remand, ... every post-Act minority group applicant for a line-driver position will be presumptively entitled to relief, subject to a showing by the company that its earlier refusal to place the applicant in a line-driver position was not based on its policy of discrimination.") (emphasis added) (footnote omitted)
 
 
 [9]
 The EEOC argues at length concerning Hardin's testimony that he never received two of the three certified letters. We fail to see the relevance of this argument. The EEOC does not dispute that the company sent the letters. Thus, whether or not Hardin received them would appear to have little bearing on the company's good faith in terminating him, unless it were also proved that the company knew that Hardin had not received the letters. There is no evidence in the record that Hardin ever brought the alleged misdeliveries to the attention of the company when he was terminated. Finally, we note that Hardin had an opportunity to testify before the trial court, and that court was entitled to disbelieve his testimony, as it obviously did