21 F.3d 184
 64 Fair Empl.Prac.Cas. (BNA) 633,
64 Empl. Prac. Dec. P 42,953
Darreyl N. YOUNG, Plaintiff-Appellant,
v.
The NORTHERN ILLINOIS CONFERENCE OF UNITED METHODIST CHURCH,
The Board of Ordained Ministry and R. Sheldon
Duecker, as the Presiding Bishop of the
Board of Ordained Ministry,
Defendants-Appellees.
 No. 93-2157.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 4, 1994.
Decided April 7, 1994.
 
 Gerald A. Goldman, Arthur R. Ehrlich (argued), Goldman & Marcus, Chicago, IL, for plaintiff-appellant.
 Gregory N. Freerksen, Samuel W. Witwer, Jr. (argued), Jennifer Kae Poltrock, Witwer, Burlage, Poltrock & Giampietro, Chicago, IL, for defendants-appellees.
 Before FAIRCHILD, MANION, and KANNE, Circuit Judges.
 KANNE, Circuit Judge.
 
 
 1
 Darreyl Young is a black female. After several years serving as a probationary minister of the United Methodist Church, she applied for a promotion to the position of "Clergy Member in Full Connection" or "Elder." A review panel of the Northern Illinois Conference of the United Methodist Church denied her request for a promotion and terminated her employment on March 4, 1992.
 
 
 2
 She notified the EEOC of her termination. It found no probable cause to proceed against the United Methodist Church.[1] It issued her a right to sue letter, and she filed a complaint in the district court.
 
 
 3
 Young's complaint alleges race discrimination, sex discrimination, and retaliation in violation of 42 U.S.C. Sec. 2000e, et seq. She claims that she was denied the promotion and fired because of her race and sex, and because of her "opposition to [the United Methodist defendant's] discriminatory practices." Specifically, she claims that the United Methodist Church did not follow the procedure it had previously "always" followed in such cases.
 
 
 4
 She requested the district court to grant her several forms of relief. First, she asked the court to order the United Methodist defendant to reinstate her as a probationary minister and award her back pay and other benefits. Second, she asked the court to order the United Methodist defendant to re-examine her application. Third, she sought compensatory damages, punitive damages, fees, and costs.
 
 
 5
 The United Methodist defendant responded with a motion to dismiss for lack of subject matter jurisdiction. It claimed that the First Amendment forbids government interference with "the internal ecclesiastical workings and discipline of religious bodies." The district court found that it could not decide the case without reaching the constitutional issue, and that the First Amendment denied it subject matter jurisdiction. It granted the motion to dismiss on that basis.
 
 
 6
 This appeal followed and calls for an examination of the district court's constitutional ruling, that the First Amendment denied it subject matter jurisdiction. Therefore we review the court's grant of the motion to dismiss de novo. Sequoia Books, Inc. v. Ingemunson, 901 F.2d 630, 633 (7th Cir.1990).
 
 
 7
 Young, to prevail, must show that the First Amendment does not preclude subject matter jurisdiction, as the district court found. To do so, she argues that "there is no doubt" that Title VII is applicable to religious organizations. In support, Young cites to E.E.O.C. v. Mississippi College, 626 F.2d 477 (5th Cir.1980). She claims in her brief that this case "applied Title VII to [a] religious organization[ ], the First Amendment notwithstanding." This is a misstatement of the case. The Fifth Circuit did not act "notwithstanding" the Free Exercise Clause. Rather, it found that the Free Exercise Clause was not implicated because "the College is not a church and its faculty members are not ministers." Id. at 485. The Fifth Circuit in Mississippi College cited to its own prior case, McClure v. Salvation Army, 460 F.2d 553, 559-60 (5th Cir.), cert. denied, 409 U.S. 896, 93 S.Ct. 132, 34 L.Ed.2d 153 (1972), which had "concluded that matters touching the relationship between a church and its ministers, including the selection of a minister, determination of salary, and assignment of duties and location, are matters of church administration and government and thus purely of ecclesiastical cognizance." Mississippi College, 626 F.2d at 485.
 
 
 8
 Young attempts to read Mississippi College as establishing a general proposition that Title VII "applies to religious organizations." But the case stands for no such thing. It explicitly exempts "matters touching the relationship between a church and its ministers." And that is precisely what is at stake in this case.
 
 
 9
 In support of her general claim that Title VII may be applied to religious organizations, Young also cites to Rayburn v. General Conf. of Seventh Day Adventists, 772 F.2d 1164, 1169 (4th Cir.1985), to demonstrate that the elimination of discrimination is a compelling state interest "of the highest order." This is unquestionably the case. But Rayburn, after noting this truism, goes on to state that:
 
 
 10
 [C]ourts must distinguish incidental burdens on free exercise in the service of a compelling state interest from burdens where the "inroad on religious liberty" is too substantial to be permissible.... This case is of the latter sort: introduction of government standards to the selection of spiritual leaders would significantly, and perniciously, rearrange the relationship between church and state. While an unfettered church may create minimal infidelity to the objective of Title VII, it provides maximum protection of the First Amendment right to the free exercise of religious beliefs.
 
 
 11
 Id. at 1169 (emphasis added). In other words, in a direct clash of "highest order" interests, the interest in protecting the free exercise of religion embodied in the First Amendment to the Constitution prevails over the interest in ending discrimination embodied in Title VII.
 
 
 12
 In Rayburn the plaintiff alleged sex discrimination when her application to serve as an "associate in pastoral care" was rejected. The court noted that even though the plaintiff was not seeking a position as an ordained minister, the "ministerial exception" the Fifth Circuit enunciated in McClure "does not depend upon ordination but upon the function of the position." Rayburn at 1168.
 
 
 13
 Having determined that the position was "important to the spiritual and pastoral mission of the church," the Rayburn court held that "the free exercise clause of the First Amendment protects the act of a decision rather than a motivation behind it. In these sensitive areas, the state may no more require a minimum basis in doctrinal reasoning than it may supervise doctrinal content." Id. at 1169 (emphasis added). See also Scharon v. St. Lukes Episcopal Presbyterian Hosp., 929 F.2d 360, 363 (8th Cir.1991) (adopting "act of decision" language when affirming summary judgment against plaintiff who alleged age and sex discrimination when fired from position as chaplain).
 
 
 14
 Contrary to Young's assertions Rayburn and Mississippi College actually indicate that Title VII may not be applied in cases such as the one before us because the First Amendment will not allow it. Nevertheless, Young forges ahead claiming that her complaint "only involves secular issues and will not require any entanglements over religious issues." The district court found to the contrary, relying in part on the case of Serbian Eastern Orthodox Diocese v. Milivojevich, 426 U.S. 696, 717, 96 S.Ct. 2372, 2384, 49 L.Ed.2d 151 (1976), for the proposition that "the composition of a church's hierarchy is also primarily an ecclesiastical matter left for the church's sole resolution."
 
 
 15
 Young attempts to distinguish Milivojevich by arguing that it holds only that a First Amendment violation occurs when a court "probes deeply" and makes "extensive inquiry into religious law and policy" when reviewing decisions of the "Highest Ecclesiastical Tribunal within a Church Hierarchical Polity." If Young's position were correct, we would have to determine how "deep" and how "extensive" an analysis the district court was required to make before we could decide if the free Exercise Clause is implicated.
 
 
 16
 The Milivojevich case demonstrates that such an analysis is unwarranted. In Milivojevich the Illinois Supreme Court had overturned the defrocking and suspension of an Orthodox bishop by his own church. The Illinois court based its decision on certain language in the case of Gonzalez v. Archbishop, 280 U.S. 1, 50 S.Ct. 5, 74 L.Ed. 131 (1929), which stated that the federal courts could review ecclesiastical decisions where there was "fraud, collusion, or arbitrariness." The court found that the church in that case had made an arbitrary decision. Milivojevich alleged, exactly as Young does in the instant case, that his church "had not followed its own laws and procedures in arriving" at its decision. Milivojevich, 426 U.S. at 713, 96 S.Ct. at 2382.
 
 
 17
 In reversing, the Supreme Court first noted that the "arbitrariness" exception in Gonzalez was dicta and had no force. Therefore, the binding precedent was the old rule set out in Watson v. Jones, 80 U.S. 679, 13 Wall. 679, 20 L.Ed. 666 (1872), which held that:
 
 
 18
 It is of the essence of religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for.
 
 
 19
 Watson, 80 U.S. at 729, 13 Wall. at 728-29. Therefore, the Milivojevich court concluded,
 
 
 20
 [n]o "arbitrariness" exception--in the sense of an inquiry whether the decisions of the highest ecclesiastical tribunal of a hierarchical church complied with church laws and regulations--is consistent with the constitutional mandate that civil courts are bound to accept the decisions of the highest judicatories[2] of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or eccliastical rule, custom, or law.
 
 
 21
 Milivojevich, 426 U.S. at 713, 96 S.Ct. at 2382.
 
 
 22
 The Court went on to hold that allowing review of "arbitrary" decisions, which in this sense means decisions which do not comply with a church's own rules or practices, is:
 
 
 23
 [E]xactly the kind of inquiry that the First Amendment prohibits. Recognition of such an exception would undermine the general rule that religious controversies are not the proper subject of civil court inquiry, and that a civil court must accept the ecclesiastical decisions of church tribunals as it finds them.
 
 
 24
 Id. In other words, religious bodies may make apparently arbitrary decisions affecting the employment status of their clergy members and be free from civil review having done so.
 
 
 25
 Young also refers to the fact that Milivojevich "left open the issue" of whether a church decision may be reviewed in the case of "fraud or collusion."[3] Whatever unlikely significance this "open issue" might have in some hypothetical case, it is certainly not implicated in this case because Young has alleged no fraud or collusion.
 
 
 26
 After summarizing Milivojevich, Young asserts that "it is evident that [it] does not foreclose review" of her complaint. In so arguing, Young selects language which would appear to allow civil court review of decisions made by religious bodies, so long as that review is not an "extensive inquiry" into "religious law and polity." Id. at 709, 96 S.Ct. at 2380. From this language Young claims that a review of the procedures which led to her firing would not have required the district court to "probe deeply enough so as to decide religious law governing church polity."
 
 
 27
 However, Young has omitted reference to the passages which define what constitutes such a forbidden inquiry, which occur a few pages later in the Milivojevich opinion. We have cited those passages above. Milivojevich, read in its entirety, holds that civil court review of ecclesiastical decisions of church tribunals, particularly those pertaining to the hiring or firing of clergy, are in themselves an "extensive inquiry" into religious law and practice, and hence forbidden by the First Amendment. Young's argument, that Title VII may be applied to decisions by churches affecting the employment of their clergy, is fruitless.
 
 
 28
 Although this is the first time this precise issue has been presented to us, its resolution is straightforward. As we have indicated, Milivojevich holds that the Free Exercise Clause of the First Amendment forbids a review of a church's procedures when it makes employment decisions affecting its clergy. Id. 426 U.S. at 712-14, 96 S.Ct. at 2382. In fact, in Milivojevich it was the precise issue of a change in internal procedure, as in this case, which the Supreme Court refused to review. The Supreme Court found this to be "exactly the kind of inquiry that the First Amendment prohibits." Id. The inquiry Young seeks is no different, and it too is prohibited.
 
 
 29
 It was no help for Young to selectively cite and thus misleadingly apply the relevant precedents, or to cite to cases yet ignore their language which clearly states that what she asks the federal courts to do is per se forbidden. To accept the position advanced by Young would require us to cast a blind eye to the overwhelming weight of precedent going back over a century in order to limit the scope of the protection granted to religious bodies by the Free Exercise Clause. There is nothing advocated by Young which raises any doubt about the correctness of the district court's decision. The dismissal is AFFIRMED.
 
 
 
 [1]
 The defendants-appellees are referred to collectively as the "United Methodist defendants."
 
 
 [2]
 The language "highest judicatories" is derived from Watson, 80 U.S. at 727, 13 Wall. at 727, which referred to the "highest ... church judicatories to which the matter has been carried." In other words, it refers to the body internal to the church which made the final disposition of the matter which subsequently gave rise to the case at hand. It does not mean that a civil court need only defer to the "highest" decision-making body of the church and may ignore the others. Rather, it means that the civil court must defer to the highest body to which the matter had been carried prior to reaching the civil court. As the Sixth Circuit pointed out in Lewis v. Seventh Day Adventists Lake Region Conf., 978 F.2d 940, 943, to attempt to do otherwise would "require a civil court to conduct a review of ecclesiastical law to determine which tribunal is the highest. This is exactly the type of inquiry which the First Amendment forbids."
 
 
 [3]
 This "open issue" is a remnant of the dicta Justice Brandeis left in his opinion in Gonzalez, which indicated that civil courts could review the decisions of "ecclesiastical tribunals" in the case of arbitrariness, fraud or collusion. 280 U.S. at 16, 50 S.Ct. at 7. The court in Milivojevich explicitly eliminated the arbitrariness exception. As to the other exceptions, it did not say "whether or not there is room for 'marginal civil court review' under the narrow rubrics of 'fraud' or 'collusion' when courts act in bad faith for secular purposes...." 426 U.S. at 713, 96 S.Ct. at 2382. Milivojevich merely leaves open, but does not endorse, the possibility that limited review would be available in cases of fraud or collusion