**Bernardo M. PEREZ**

v.

**FEDERAL BUREAU OF INVESTIGATION, et al.**

**No. EP–87–CA–10.**

United States District Court,
W.D. Texas,
El Paso Division.

May 5, 1989.

---

Antonio V. Silva and Jose Angel Silva, Jr., El Paso, Tex., and Hugo A. Rodriguez, Coffey, Aragon, Martin & Burlington, P.A., Miami, Fla., for Bernard M. Perez.

Richard Greenberg and Herbert E. Forrest, Dept. of Justice, Federal Programs Branch, Civil Div., Joseph R. Davis, Legal Counsel Div., F.B.I., Washington, D.C.,

Mollie S. Crosby, U.S. Attorney's Office, El Paso, Tex., Lainie J. Simon, Civil Branch, Alan L. Ferber, Trial Atty., and Anne M. Gulyassy, Asst. Director, no Pro hac vice, Federal Programs Branch, Civil Div., U.S. Dept. of Justice, Felix A. Baxter and Steven L. Zelinger, no Pro hac vice, Dept. of Justice, Civil Div., Washington, D.C., for F.B.I., Edwin Meese, Atty. Gen., and William S. Sessions and William H. Webster, Directors, F.B.I.

Kathleen C. Anderson, Law Offices of Kathleen C. Anderson, and Richard P. Mesa, El Paso, Tex., for Thomas M. Kuker and Thomas A. Hughes, intervenors.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

### BIFURCATED TRIAL: DAMAGES STAGE

BUNTON, Chief Judge.

BEFORE THIS COURT came on for trial the Plaintiff class consisting of present or one-time Special Agents of the Federal Bureau of Investigation, alleging that the FBI violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e–2 discriminating against Hispanic agents on the basis of their National Origin.[1]

On Motion of the parties, the litigation was bifurcated into a "liability" stage to determine whether the Defendant violated Title VII and a "recovery" stage to determine appropriate remedies under Title VII of the Civil Rights Act. In the recovery portion, the evidence related to two issues: (1) what, if any, institutional reforms would correct the patterns and practices the Court found which were violative of Title VII; and (2) whether individual class members were eligible for compensatory relief?

In summary, at the conclusion of the trial in 1988, the Court determined that the Plaintiff class prevailed on its allegation that there was a pattern and practice of discrimination relating to conditions of employment and promotions within the Bureau; the EEO program in the Bureau is in need of significant improvement; and named Plaintiff Perez was the victim of retaliation for protected activities related to this litigation and his EEO complaint.[2] By a separate opinion entered December 8, 1988, the Court found an additional incident of retaliation against Plaintiff Perez relating to the procurement of a Grand Jury subpoena and the use of Grand Jury materials in an administrative discipline procedure.

Prior to the commencement of the recovery portion of the trial, the Court detailed to the parties the matters within the purview of the Court. *Inter alia,* the Court stated that the parties should present evidence relevant to the development of appropriate equitable remedies. Section 706(g) of Title VII, 42 U.S.C. Sec. 2000e–5, does not authorize awards of punitive damages or compensatory damages. Awards of back pay, front pay, remedial seniority, injunctions and declaratory relief are among the equitable tools available to this Court to fashion relief.[3] The Court welcomed testimony relating to FBI programs which are responsive to the findings of the Court on September 30, 1988.[4] The

---

**1.** The Court emphasizes that allegations of discrimination on the basis of the hiring practices of the FBI was not a part of the suit. The focus of the suit was: (1) conditions of employment and (2) promotional practices for *Special Agents within the Bureau.* Accordingly, the manner in which a person enters the Bureau—benefiting from a minority or special skill recruitment classification—is irrelevant to the conditions of employment and promotional opportunities available to him or her within the Bureau. Some witnesses produced by the Bureau testified to their belief that the entrance criteria for minority agents was lower, and therefore justified certain disparate conditions of employment or promotional opportunities, the Court rejects this view.

**2.** The Court rejected Plaintiff's claim that they were subject to religious discrimination; and found unsubstantiated Class-wide claims of administrative discipline and discrimination in terms of office assignments and transfers.

**3.** See discussion of the September 30, 1988, Memorandum Opinion and authorities cited therein, 707 F.Supp. 891, 926.

**4.** No party's right to appeal the findings of this Court relating to liability will be compromised by assisting the Court in fashioning equitable remedies.

parties were invited to present evidence by way of testimony or documents.[5] Regarding back and front pay, the Court reminded the parties that on the basis of the findings in the liability portion of the trial, the burden would be on the Plaintiffs to demonstrate the appropriateness of an award of monetary relief.[6] In addition, prior to the recovery stage trial, the Court invited testimony relevant to the fashioning of appropriate remedies for the retaliation against Bernardo Perez found by this Court.

■ For the reasons set out below, the Court finds that certain institutional reforms are appropriate and by mandatory injunction will direct the implementation of the Court's findings. 'Rightful place seniority' is an appropriate remedy for members of Plaintiff's class who achieved the rank of GS 13 (with one year experience) or above by the date of this opinion. The Court will detail procedures for the accomplishment of individual hearings for Plaintiff class members to determine their entitlement to this relief in an appendix to this opinion.

■ To implement the awards, the Court will appoint three persons as Special Masters, hereinafter called "Panel," set a limitations period for the accomplishment of hearings, and provide a several stage appeal process: first to the Director of the FBI, second to United States Magistrate Janet Reusch, Western District of Texas, El Paso Division, hereinafter called "Magistrate," and third to this Court.[7] No back pay monetary remedy will be made to members of the Plaintiff class. However, should the finding of the Panel require a rightful place promotion, within 45 days from the date of the Panel finding to the date the Special Agent actually attains the rightful place position, The Special Agent will be compensated at the rate of the correlative promotional position. This Court will fashion a remedy for Bernardo Perez. Finally, by separate opinion, the Court will fashion an award of attorney's fees for counsel for the Plaintiff class.

### Whether Promotion Quotas are Appropriate?

■ Plaintiffs argued that pursuant to Section 706(g) of Title VII, injunctive relief should take the form of so called "affirmative action" such as preferential treatment for members of the Hispanic protected classification. On occasion, the law authorizes the use of preferential racial, ethnic or other minority classifications for specific or identifiable past discriminatory practices. *Regents of University of Cal. v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). However, unless there are specific findings of past discrimination, based upon racial, ethnic or other minority group classifications, preferential remedies on a class wide basis are generally considered inappropriate. *Regents of University of Cal. v. Bakke, Id.; Furnco Construction Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957.

In this cause, the Government resists the imposition of quotas or a system of preferential promotions.[8] Three arguments are advanced by the Bureau: (1) Hispanics are not the victims of discrimination; (2) the "needs of the Bureau" require the appoint-

---

5. Direct and Cross examination will be permitted to develop testimony for the purpose of informing the Court of the scope of relevant programs, inherent constraints, and the sufficiency of the proffered remedies.

6. A distinction should be made between the *appropriateness* of monetary relief and the *entitlement* of individual class members to monetary relief. A finding that monetary relief is appropriate for the nature of the disparate conditions of employment and promotional opportunities would permit the second stage analysis of whether individuals within the class are entitled to monetary relief.

7. Of course, an appeal of right pursuant to Rule 4, Federal Rules of Appellate Procedure may be made from this Court's finding to the Fifth Circuit Court of Appeals.

8. Thus, this case is not similar to the circumstances before the Supreme Court in *United Steelworkers of America v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979) where the Court held that Title VII does not prohibit employers and unions in the private sector from taking voluntary race-conscious affirmative action to eliminate manifest racial imbalances in traditionally segregated job categories.

ment of the most qualified person, without respect to membership in a protected class, to fill supervisory positions; and (3) this Court did not find classwide incidents of promotional discrimination. The Court's findings demonstrate that in fact the Bureau does not have in place the means to properly determine the most qualified person for promotion. Consequently, members of the Plaintiff class have been prevented from gaining the professional experience and training that non-Hispanics have been afforded. The Court admits that this finding does not translate directly into a classwide "failure to promote" finding. Further, the imposition of quotas or preferential promotion are drastic remedies which should be Ordered only upon a showing that the discriminating employer has resisted less intrusive reforms.

The circumstances before this Court are unique both with regard to the nature of the employer and the nature of the violation of Title VII identified by this Court. Without reaching the legal issue of whether Title VII permits this Court to set quotas, the Court finds that such a remedy would unduly intrude on the power of the Executive to implement the mission of the FBI. This conclusion in no way detracts from the firm conviction of this Court that the Bureau violated Title VII of the Civil Rights Act. However, the Court is of the opinion that improvements can be accomplished by other means.

 Similarly, the Court does not find that a classwide award of seniority is appropriate. The policy behind section 706(g) of Title VII is to provide make-whole relief only to persons who have been the actual victims of discrimination. *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984). Mere membership in the disadvantaged class is insufficient to warrant a seniority award. The classmembers must demonstrate that the discriminatory practice had an impact on them. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) on remand 659 F.2d 690 (5th Cir.

1981). Even where a classmember demonstrates entitlement to rightful place seniority, the Court will not require a non-minority employee displaced to make room for the Special Agent. Accordingly, though seniority, in principle, is an appropriate remedy for some members of Plaintiff class, it will not be awarded to every member of the class.

### *Whether Compensation For Extra Duty Can Be Awarded?*

This Court found discrimination in the conditions of employment which had a significant effect on promotional opportunities for members of Plaintiff Class in violation of Title VII. This is a two-pronged finding. Without waiving their objection to this Court's findings, Defendant sharply contests whether a compensation differential is the appropriate remedy for the disparate conditions of employment found by the Court. Defendant argues that persons outside of the protected class are required to perform extra duties, harder duties, and unrecognized duties, *for which they do not receive extra compensation.* The Court agrees in principle that Bureau Special Agents do not receive compensation on any basis other than their promotional grade. The evidence demonstrated that the Bureau does not utilize pay differentials within grades to compensate persons who perform more work or even more valuable work than their counterparts.[9] Nonetheless, the evidence firmly establishes that Hispanics, as a class, experienced significant and materially disparate conditions of employment in violation of Title VII *which resulted in significant differences in promotional opportunities.* No evidence received during the damages portion controverted the findings of this Court in the liability portion related to promotional opportunities.

Similarly, the Court found that the contributions made by Hispanic Special Agents were *under-valued* by the Bureau. The finding relates directly to the promotional decisions and only indirectly to the compensation of Hispanic Special Agents. Thus,

---

**9.** However, see footnote 30 for a recently enact-ed exception to this principle.

the determination of what would "make whole," for purposes of Title VII, the class-members who have been the victim of disparate conditions of employment and promotional opportunities, is complex.

■ The Fifth Circuit has interpreted 42 U.S.C. 2000e–5(g) in a manner consistent with the Supreme Court's refusal to include compensatory damages such as an award for mental anguish or punitive damages. *Bennett v. Corroon & Black Corp.*, 845 F.2d 104, 106 (5th Cir.1988). Though the Fifth Circuit has not specifically ruled out a theory of compensation which would retroactively pay employees according to their contribution, it appears that this theory of recovery would violate the "make whole" provision of Title VII. See e.g. *American Nurses Ass'n v. State of Illinois*, 783 F.2d 716, 729 (7th Cir.1986); *Lemons v. City & County of Denver*, 620 F.2d 228, 229 (10th Cir.), *cert. denied*, 449 U.S. 888, 101 S.Ct. 244, 66 L.Ed.2d 114 (1980).[10] But most directly, since there was no evidence that non-Hispanic Bureau members of the same grade were paid more than Hispanic peers, Title VII does not authorize this Court to pay Hispanics more as a remedy for disparate conditions of employment.

### *Whether Back Pay Will be Awarded?*

■ Back pay is appropriate, in general, when the discrimination causes some economic loss. An award of back pay to an entire class must rest on specific findings of employment discrimination directly related to wage differential. See e.g. *Segar v. Smith*, 738 F.2d 1249 (D.C.Cir.1984). In *Segar*, the Court approved a class wide back pay award based on a factual finding that Blacks as a class suffered a wage disparity with whites as a class. The statistical disparity was clear and compelling. The discrimination identified by this Court, while no less serious under Title VII, has a less direct relationship to pay differential.[11]

Thus, individualized assessment of the effect of the disparate conditions of employment on a Special Agent's career together with retroactive review of (nearly unreviewable) promotional decisions would be necessary to determine whether back pay was appropriate for a member of Plaintiff's class. In the discovery portion of this trial, the Court learned that the personnel file of each agent averaged four volumes and 2000 pages. The nature of the evaluation would require comparisons with other Special Agent's careers who are not members of the Plaintiff Class. Further, comparisons would be rendered more difficult because this Court specifically found that Hispanic Special Agents have been excluded from experiences and training which prepare agents for advancement.

Anecdotal testimony supported the Court's discounting the probative worth of statistical studies which take as a starting point that no person was dissuaded from seeking promotion. This finding, however, cannot be translated into a classwide finding that classmembers were discouraged from entering the career development program. To determine whether an individual class member was discouraged from entering the career development program and fashioning of a back pay award would require extraordinary extrapolation from the documentary evidence available to the parties and presented to this Court.

The Record in this cause heretofore does not support a finding of back pay for any classmember. The determination of appropriate back pay would rest on the determination of a specific date and position on which promotion was denied. The Plaintiffs have stoutly resisted the use of a "claim form" as a discovery device where Special Agents must state with specificity the factual grounds for their request for relief as a condition precedent to further proceedings. Due Process would require additional discovery, and the convening of

---

**10.** Defendants correctly point out that though Congress provided comparable worth retroactive compensation under the Equal Pay Act, 29 U.S.C.Sec. 206(d) with respect to gender differentials, Title VII contains no such specific remedy provision within its scope.

**11.** See generally, Memorandum Opinion on Findings of Fact and Conclusions of Law, Liability Stage, September 30, 1988, 707 F.Supp. 891, 904.

individual hearings where classmembers are represented by counsel. This Court and Appellate Panels would be required to make hundreds of factual findings with respect to each classmember's request for back pay on the basis of incomplete records and hearsay.

The cost to the Government would be enormous; the burden on the Court system significant; and the diversion of Agent's energies from the mission of the Bureau serious. In fact, this suit has not primarily been about monetary damages; rather, unfair conditions of employment and barriers to promotion. The Court, in some detail below, outlines program reforms which would lower barriers to promotion and equalize the burdens of certain conditions of employment. Plaintiff's request for back pay will be denied as an inappropriate remedy. Appropriate remedies will take two forms: (1) procedures for determination of 'rightful place seniority' for classmembers with the rank of GS 13 and above; and (2) reforms in Bureau policies which are closely tied to practices found in violation of Title VII.

### "Rightful Place Seniority" For Individual Members of the Class

The reasons which make a finding of back pay for individual classmembers inappropriate do not apply directly to the determination of 'rightful place seniority.' The finding that an individual's career has been particularly burdened by discriminatory conditions and such individual does not hold a position for which he or she is particularly well qualified mandates a different inquiry than the finding of denial of a specific promotion.

The finding that an agent by experience and ability has demonstrated an aptitude for leadership but has been prevented from achieving promotions because of the barriers identified by this Court is capable of review in the context of the findings of this Court. Among the relevant considerations will be: (1) the extent to which an agent was rated superior for performance; (2) the receipt of any special award or commendation which did not translate into expected promotion; (3) high MAP scores; (4) evidence that fellow non-Hispanic agents with similar experience and tenure have been promoted; and (5) evidence that the agent has performed undercover work or temporary duty assignments (within or without the office) to such a degree that other investigative experiences or training have been foregone.

The Court specifically finds that an award of rightful place seniority is appropriate as vacancies occur in the Bureau for classmembers of GS 13 rank and above and within the equitable discretion of this Court. *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 770–71, 96 S.Ct. 1251, 1266–67, 47 L.Ed.2d 444, 464–65 (1976).

Because the findings of this Court related to administrative profile of Hispanic Agents [12] the longer an Hispanic agent has served in the Bureau the more weight should be given to indices of success other than administrative profile. Thus, the absence of broad investigative experience for an agent with 10 or more years of tenure raises the strong presumption that disparate conditions of employment in violation of Title VII have hindered the classmember's career advancement. In this event, generally high MAP performance or specific investigative successes should be given greater weight.

The Director of the Bureau or his representative should be given the opportunity to voluntarily reevaluate classmembers who have reached the level of GS 13 or above [13] in line with the findings of this Court and determine whether rightful place seniority is appropriate. A Panel is being appointed to perform independent review of those agents who have reached the level

---

**12.** See Memorandum Opinion, 707 F.Supp. 891, 909.

**13.** After entering the bureau, Special Agents are normally promoted from Grade 10 to Grade 11 after two years of competent service; from Grade 11 to Grade 12 after two more years; and from Grade 12 to Grade 13 after completion of three successful years at Grade 12. Management ranks begin at Grade 14.

of GS 13 to determine whether a recommendation of promotion for the classmember will be made.[14]

The only remedy available to the Panel for recommendation will be promotion to a higher grade and position. The recommendation will be made after review of the personnel file of the agent, interview of the classmember and persons named by the Bureau, and any other relevant information determined by the Panel.

Hearings before the Panel will be recorded for transcription if necessary. The Hearings will not be conducted as adversarial in nature. The hearings will proceed on questioning by the members of the Panel to develop the factual reasons in support of the classmember's application for "rightful place seniority." The relevant issues before the Panel for inquiry will be: (1) has the classmember experienced to a significant degree the weight of the disparate conditions of employment? (2) Have these conditions been the cause of failure to advance in the Bureau? (3) Does the administrative profile of the agent fairly reflect the contribution of the agent to the Mission of the Bureau? (4) Has the Special Agent recently attained promotion commensurate with his experience and abilities?

There shall be no cross-examination of class members by any person. However, a representative of the Bureau or the Justice Department may suggest additional areas of inquiry for the Panel or bring to the attention of the Panel the identity of persons who are available to provide evidence relevant to the classmember's request. No legal counsel will be provided Special Agent class members. That a representation by any person or any document before the Panel is hearsay in nature shall not be a reason to exclude the evidence from consideration by the Panel.

Both the Bureau and the Classmember will have the right of appeal from the recommendation of the Special Master. A finding of the Special Master that the classmember is not recommended for promotion at the time of the hearing is appealable to the Magistrate. Notice of appeal should be made by letter by the classmember within 20 days of the receipt of the notice that no Recommendation of Promotion will be made by the Panel.

A recommendation of promotion by the Panel shall be delivered to the Director of the Bureau or his designated representative. The Bureau may accept or reject the recommendation within 20 days of the date notice of the Recommendation is received by the Bureau. The Director may implement the recommendation according to the "needs of the Bureau." The Director is not required to replace any Bureau supervisor with a Classmember. The Court will set no time limit within which the Bureau must give supervisory responsibilities to a Special Agent. These matters are left to the discretion of the Director of the Bureau.

Appeal by the Bureau shall be made to the Magistrate. In all appeals to the Magistrate, no evidence other than the evidence before the Panel will be considered by the Magistrate sitting in review of the findings of the Panel. The Director and the Special Agent classmember may submit memoranda in support of their positions within 20 days of the date of notification of appeal to the Magistrate.

The Magistrate sitting in review may overturn, affirm, or remand for further fact finding the recommendation of the Panel. Remand for further fact finding should be Ordered in only rare instances. Except for the prohibition regarding the

---

**14.** On April 25, 1989, the Court attempted unsuccessfully to contact William Byham to request that he serve as Special Master of the Court with respect to the Rightful Place Seniority Hearings. The Court reasoned that Byham was familiar with the Bureau and demonstrated competence and fairmindedness to the Court. The Court was contacted informally by Counsel for Defendant on April 27 to request clarification of this Court's motive for contacting By-

ham. Counsel for the Defendant was informed that the contact did not relate to the subject matter of Byham's testimony to this Court regarding institutional reforms required by the Court's findings in this Cause. Noting Defendant's objection and the indirect attempt to impugn this Court's integrity, the Court contacted an equally qualified person to serve in Byham's stead as Special Master.

receipt of additional evidence, the Magistrate will review the evidence *de novo.*

The burden of persuasion of the matters before the Panel and upon appeal shall be by the preponderance of the evidence. A finding of the Panel that a classmember is recommended for promotion will result in a pay increase to the Special Agent commensurate with the promoted position on or before the 45th day following the recommendation of the Panel absent further Order of this Court or the Magistrate.

Appeal from the finding of the Magistrate shall be to this Court. No additional evidence will be received by this Court.

By separate Order this day appended to this Memorandum Opinion, the Court will appoint the Panel and set out procedures related to the Panel hearings.

### Reforms in Bureau Policies

■ A finding of a violation of Title VII justifies issuance of an injunction against the discriminatory practice. See *International Board of Teamsters v. United States,* 431 U.S. 324, 361, 97 S.Ct. 1843, 1867, 52 L.Ed.2d 396 (1977).

The Court found that the FBI employs a subjective evaluation promotional system for all levels within the Bureau which fails to have a review mechanism to ensure compliance with Title VII. In particular, the Court found that:

"No recommendations are sent to the EEO officer to ensure compliance with EEO guidelines. Notes from the meetings are incomplete and do not give evidence of the considerations involved in selections. No systems are in place by which patterns of minority promotion can be examined to detect the presence of prohibited considerations. Excessive weight is given to subjective evaluations of persons not present and who occupy lower level supervisory positions. The

recommendations of the Career Board are not binding on some lower level management persons and are often disregarded. Not all job vacancies are advertised to all candidates who may be qualified. To the extent that 'objective' criteria are within the purview of the Career Board members, the numerical compilation of successful investigative work undervalues the contribution of Hispanics to the success of those investigations."

There may be between 30 and 40 vacancies under consideration at each career board meeting. Though heretofore minutes have been made of career board deliberations, the Court finds that the minutes do not document all aspects of the discussion and the summary of those matters covered is insufficient to allow meaningful review of the true basis of decision-making. The minutes themselves are not available to unsuccessful candidates for positions. The position of the Defendant and its individual managers with respect to disclosure of the minutes or recording the deliberations is that disclosure would inhibit candid discussion of material aspects of the selection process.[15] One manager admitted without elaboration that there are additional "privacy act problems." The clear implication of "privacy act problems" is that since candidates would have some right to gain access to the records, creating no record at all is the best solution.

The Bureau stated at trial that a grievance procedure for unsuccessful candidates is in formation. Though the elements of the grievance procedure are as yet unformulated, the final program would allow Special Agents to have some sort of quasi-independent review of the selection process. However, because of the secret and unverifiable nature of the deliberations, any grievance procedure would be long on good intentions and short on tangible im-

---

15. Later, the witness expanded on this view by explaining that "not everything is recorded in an agent's personnel file" and that anecdotal matters are discussed by career board members who possess such information directly or indirectly. The protection from subjective discriminatory decisions is the presence of a minority representative on the Executive Career Board and the presence of the Director of the FBI's representative on the Senior Executive Career Board. The Court notes that the Director's representative has been on the Senior Executive Career Board these past 10 years.

provement in the fairness of the promotional process.

By written submission, the Bureau stated that career board's hereafter would be required to make a complete written record of any deliberation which involved a Title VII "protected characteristic" of an employee. Though this effort at reform signals an improvement over the previous practice, it does not go far enough. Discrimination manifests itself in a peculiar manner; i.e. persons who discriminate are often not aware that they are making a determination on the basis of a prohibited classification. The nature of the discrimination found by this Court to be in violation of Title VII is not easily amenable to detection or correction. Any program reform which leaves promotional decisions largely unreviewable is insufficient. The reform made by the Bureau which would require documentation of only those discussions which involve protected characteristics is also unnecessarily complicated and extremely difficult to manage. Rather than leave to the discretion of the career board the determination in advance of the area of discussion which implicates Title VII and recording of same, a better remedy is to presume that all discussions of subjective evaluations and decision making requires memorialization.

The Supreme Court recognized that subjective promotional evaluation systems are sensitive to impermissible consideration of prohibited characteristics.[16] No amount of fine tinkering of the record keeping for an essentially unreviewable career board promotional system will satisfy Title VII or the findings of this Court. The Bureau's view that recording of career board deliberations would inhibit frank and candid discussions of the agent's abilities is without merit. The evidence demonstrates that persons within the Bureau violated the requirements of Title VII believing that consideration of prohibited characteristics was permitted to serve "the needs of the Bureau" or for other good reason. The Court pointed out the error of this thinking in its previous findings on the liability portion of the trial and was given no reason during the second portion of the trial to rescind its findings. Neither Congressional inquiry into sensitive matters nor Judicial proceedings require secrecy as an operating principle and for similar reason, career board deliberations shall not require secrecy as an operating principle.

In the Bureau Career Development program heretofore there has been no appeal process, no independent review of process or outcome of the Career Board deliberations. If review of a discrete personal deci-

---

**16.** The Court restates the relevant portion from its Memorandum Opinion on the liability portion of the trial found at 707 F.Supp. 891, pages 899–900.

"Until the *Watson* [*Watson v. Fort Worth Bank & Trust*, —— U.S. ——, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988)] ruling in the closing days of the Supreme Court's 1988 term, all of its 'disparate impact' cases involved standardized employment tests or criteria. *Albemarle Paper Co., v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) (written aptitude tests); *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) (written test of verbal skills); *Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977) (height and weight requirements); *New York City Transit Authority v. Beazer*, 440 U.S. 568, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979) (rule against employing drug addicts); *Connecticut v. Teal*, 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982) (written examination). Watson represents an expanded use of disparate impact theory into the area of employment policies and procedures which contain subjective evaluation elements. Hereto-

fore, courts could presume that valuative mechanisms which were not amenable to rigid, standardized criteria and required subjective elements must be analyzed under the disparate treatment analysis which required a finding of intentional discrimination.

Over the strong objection of the employer that subjective selection practices would be impossible to defend under disparate impact analysis, the Supreme Court reasoned that employment decisions based on subjective employment criteria may have effects that violate Title VII even though they are neutral on their face and discriminatory animus cannot be easily proven. *Watson*, —— U.S. at ——, 108 S.Ct. at 2786. There are two aspects of this finding which are especially relevant to the factual issues in the case at bar: (1) selection systems which combine 'subjective' and 'objective' criteria are generally 'subjective' in nature; and (2) when discretion is delegated in an organization, there is a danger that the person designated to perform the key evaluation may act with discriminatory intent in a manner which violates Title VII."

sion were attempted, the minutes would be virtually worthless to perform meaningful review. The applicant pool before the career board is ill defined, artificially limited, and departed from in promotions without explanation.[17]

For these reasons, the Court finds that the recording of Career Board deliberations is an appropriate remedy. In addition, the FBI shall be enjoined from promoting a person to the position of GS 14 or above who was not a part of an applicant pool before the Career Board whose qualifications were considered in the context of other applicants.

Career board records will be available to the EEO officer, the Office of Personnel Resources within the Bureau, and the Director of the Bureau. In a manner within the discretion of the Director and for good cause, applicants may be given access to career board records in whole or in part.[18]

The Bureau has set ambitious though indistinct goals in the reforms presented to the Court. For example when persons opt out of the career development program the incident will be tabulated by the Bureau to determine whether a pattern emerges to demonstrate discriminatory conditions or decisions. Further, the Bureau will undertake to monitor annual evaluations to detect incidents of discriminatory bias. The Court observes that these reforms, while well intentioned, are fine tuning of a system that requires more dramatic repair. Title VII of the Civil Rights Act under the circumstances detailed in this Court's findings on September 30, 1988 require a promotional system which is available for review and less amenable to personal bias. Accordingly, promotional deliberations will be recorded and fully documented and the SAC's authority to promote in disregard of the recommendations of the Career Board will be removed.

The Bureau has determined that henceforth there will be a minority representative on Career Boards who may vote if the position under consideration is of equal or lower rank. Under this plan, the minority member will serve as an observer if the position is of higher grade than his own. The Director of the FBI will choose the minority representative and this procedure will not be disturbed by Order of this Court. However, merely placing a minority member on field office Career Boards does not satisfy the requirements of Title VII and the findings of this Court. Unless the deliberations of the Board are otherwise reviewable, the presence of a minority person, whether voting or not, is of small (but not insignificant) consequence.

Testimony reflected that the SAC has a large role in selecting and supervising the persons on the career board; this supports the need to make a record of the deliberations. However, the evidence demonstrated that a SAC has significant direct input on the matters before the career board. On at least three occasions previously there occurred undocumented, informal recommendations regarding career board positions by SACs. This will not be permitted. All contacts regarding the SAC's recommendations to the career board will be in writing or a written record made of the contact. These will be made a part of the career board record.

The Bureau implemented a system providing that if any SAC disagreed with the recommendation of the career board, the SAC's disagreement and reasons for making an alternate selection will be in writing. This procedure together with other recent reforms, in the context of the FBI evaluation and promotional system, do not comport with the requirements of Title VII of the Civil Rights Act and is terminated by

**17.** It should be remembered that this Court concluded that the danger of discrimination is not merely impermissible discussion of objectifiable factors related to the promotional decision. In addition, this Court identified disparate conditions of employment and hidden bias in the evaluations made of minority candidates, both of which combine to make the record before the career board skewed in a manner which vio-

lates Title VII. See generally, Memorandum opinion, September 30, 1988, 707 F.Supp. 891.

**18.** The Bureau has stated that a grievance procedure is in formulation for applicants for career board promotions. The records required by this Court's Order will facilitate the grievance procedure.

implication of the Court's injunction this day.

Bureau policy allows a SAC to disregard the recommendation of the career board entirely. This policy is an anathema to nearly every reform advanced by the Bureau and Ordered by this Court to improve the fairness and reviewability of an excessively subjective promotional process. SAC's have a right to have input into the selection of the best persons to serve under their command. They may do so by formal recommendation to the career board. However, the policy permitting SAC's to disregard the appointment of the Career Board or to direct the career board to reconvene to consider an additional candidate selected by the SAC will cease forthwith.

The reasons advanced by officials of the Bureau in support of the enormous discretionary power of the SAC are not legitimate, reasonable reasons to justify a practice which is capable of misuse for all of the reasons contained in this Court's findings.

The Bureau began a system whereby all candidates will be informed by teletype of the person selected for promotion. This reform is a positive step in improving the promotional system and will not be disturbed.

The Bureau considered and rejected the recommendation of Plaintiffs to put an FBI Equal Employment Opportunity officer on career boards. The Court is of the opinion that the Bureau's decision in this regard is appropriate and will not be affected by Order of the Court.

The Plaintiff, through expert testimony, objected to the procedure of the career board that does not perform a systematic interview procedure prior to acting on a job vacancy. Under the injunctive Order of the Court this day requiring recording of career board proceedings, the Court is of the opinion that systematic interviewing of all candidates for promotion is not required.

Similarly, the Plaintiff's objection to the fairness of career board deliberations because the members are not trained "raters" is also obviated by the effect of the Court's injunctive relief and no further relief based on this objection by Plaintiff will be granted.

The Bureau has represented to the Court that additional training and encouragement will be provided to career board members and SAC's on the discriminatory elements which are contained in the Court's findings. The Court accepts this effort as a positive effort to improve the performance of the Bureau under Title VII and will not be affected by Order of this Court.

The Defendant produced evidence of the practice of periodically convening a Special Agent's Advisory Committee made up of investigative agents within the Bureau who give "unfiltered input to the Director." Persons who serve on the Special Agent's advisory committee are "self selected" by fellow agents. Upon inquiry by the Court as to whether an Hispanic agent in the previous five years had served on the Advisory Committee, the witness responded that he would find out and respond to the Court. No response to the Court's inquiry having been forthcoming, the Court concludes that no Hispanic agent has been selected to the Special Agent Advisory Committee. The Court discounts this sort of *ad hoc* means of soliciting input as a means by which management of the Bureau increase knowledge of the fairness of promotional practices or conditions of employment within the Bureau. The Bureau may continue the practice or halt it at its own discretion. It should be noted that such a practice is contrary to the very purpose the evidence was offered to support; access to Bureau personnel and policy decision makers which is informal and *ad hoc* has grave danger of violating Title VII of the Civil Rights Act.

The Plaintiffs object that the Bureau does not have standardized, detailed, performance based job evaluations. The Court reviewed the performance appraisal system utilized by the Bureau and the reforms and additions suggested by the Bureau. No exercise of injunctive powers by the Court will be made with respect to the Bureau performance appraisal system.

*MAP Program*

At the liability stage of the trial, the Plaintiffs attacked the selection procedure of Special Agents to the MAP assessment program, and the low percentage of Hispanic MAP assessors. Defensively, officials of the Bureau pointed to MAP as an "objective" rating procedure which enhanced the fairness of the promotional process. The Court made these comments on review of the testimony presented by the parties during the liability stage of the trial relating to MAP:

> "Some past or present members of the Career Board offered the results of the MAP assessment as "objective" indices available to the career board by which to evaluate candidates. In fact MAP is a valuative tool with large subjective bias opportunities. Qualitative evaluations are transferred to numerical index and given the appearance of objectivity. In addition, Defendant did not present at trial any summary listing the minority make up of MAP assessors. Nor is there a statistical summary of the number of Hispanic Special Agents assigned to MAP over a statistically significant period of time." September 30, Memorandum Opinion on Findings of Fact and Conclusions of Law, 707 F.Supp. 891.

During the damage portion of the trial, the Government supplemented the Record with respect to the MAP program, however, Defendants did not demonstrate the number of Hispanic assessors or controvert the anecdotal evidence that Hispanic Special Agents were assigned to MAP in significantly and disproportionately lower numbers numbers than Non–Hispanics. If such controverting evidence were available, it would have been presented to the Court.

On the basis of the evidence presented during the recovery portion of the trial the Court's reservations concerning the conception of the Management Assessment Program were assuaged. However, the thrust of Plaintiff's objection that Hispanic agents are under-represented in selection to attend the MAP training program and that the results of the MAP assessment are used inconsistently by the Bureau in the promotion of its agents was clearly demonstrated.

As originally conceived in 1975, MAP was an effort to critically measure those abilities which would make successful field supervisors and use the assessment for selection of supervisors within the FBI. MAP is not a purely objective selection method, however, its purpose is to make inherently subjective evaluations as fair, organized and systematic as possible.

In 1975, Dr. William Byham surveyed FBI supervisors and Special Agents to determine those behaviors and abilities which made them successful (or unsuccessful) supervisors. The benchmark for success was a matter of consensus. The results of the study became the dimensions, or "critical elements," which were the basis of the evaluations performed in the MAP assessment.[19]

The evidence at trial demonstrated that the FBI has experienced shifts as to program priorities, and Byham, appearing on behalf of the Government to testify in support of the fairness of the MAP program, agreed that such a shift justifies periodic fine-tuning of the dimensions which were determined in 1975.[19] Further, Byham testified that only 1 or 2 Hispanics, if any, were interviewed by him among the several hundred agents surveyed in 1975. No Hispanic supervisors were the basis of his survey. Today, the FBI does not directly use the results of MAP as criteria for promotions. Rather, deficiencies in performance are reported to supervisors in the field who are charged with evaluating the Special Agent's performance and no limitation is presented upon the use of this information by supervisors. Byham admitted on cross-examination that in his opinion MAP should appropriately be used in pro-

---

**19.** The uncontroverted testimony of a former MAP program administrator is that the upper-management level MAP II program was modified in 1981 to reflect the changed program priorities and expansion into drug investigations. No explanation was given for failing to make similar modifications to MAP I.

motion decisions.[20] It is undisputed that MAP has not been directly used in promotion decisions since 1981 when the Bureau determined that the rigid pass/fail system was unreliable for determination of the best supervisors.[21] The evidence supports the inference that its results creep into the promotion evaluation decisions informally and not in the manner in which it was originally conceived.[22]

Thus, the Defendant's presentation is anomalous. The MAP program which Defendant offered as evidence of fairness in FBI programs is not used in the manner in which its own expert conceived the program. MAP, arguably the best example within the Bureau of a technique to make subjective evaluations fair and systematic, is specifically *not* used directly in the promotional decisions in favor of a more subjective, less verifiable, and less systematic promotional system.

The Bureau represented to the Court that more Hispanics will be selected and trained as assessors to MAP. This reform is a positive step though it does not go far enough. By injunctive Order this day, the Court will direct the Bureau to commission a study to determine if the shifting program priorities since 1975 require a change or changes in the valuative dimensions of the MAP program. A report is to be made to the Director within 12 months of this date and a copy filed in this Court. If changes are recommended in the valuative dimensions, the changes are to be implemented within 18 months of this date.

In addition, the Bureau will be enjoined from distributing the results of its MAP assessment to supervisors unless MAP is made a significant and material basis of the promotional system.

**20.** The misuse of the MAP testing system is not the only point upon which the Bureau and the Government's own expert part company. The Bureau maintains that only Special Agents can serve as assessors in MAP; Dr. Byham contends that non-Bureau personnel who are trained assessors can ably staff the assessment center.

**21.** The focus of the Court's attention in this section is the MAP I program for field supervisors. The Bureau conducts a MAP II program for promotion to ASAC and SAC positions. Un-

Under the present system, field office ASAC's and SAC's select who will attend MAP. Ostensibly, these persons choose persons who show greatest potential to succeed as supervisors to attend MAP. Thus, the first decision with respect to the capability of MAP to inject fairness into the promotional system is already fraught with subjective bias. To this day there has been no monitoring of the manner of selection of candidates for MAP or a competent statistical summary of the persons who have attended MAP by racial and ethnic classification. No objective or verifiable criteria are applied by a SAC to select candidates for MAP.

It is secondarily ordered that the Bureau monitor the selection of persons for attendance at MAP to comply with the requirements of Title VII. It shall also provide significant opportunities for members of Plaintiff's class who have been found to suffer the weight of disparate conditions of employment to attend.

### EEO Program Improvements

The Court previously found that the EEO program within the Bureau has not accomplished the goals Congress envisioned in devising the EEO program and it was in serious need of revision. The Court targeted insufficient training for Counselors, failure to study FBI promotional processes to ascertain if there was compliance with Title VII, and practices which created a significant danger of retaliation by superiors for the filing of a grievance. Though there was insufficient evidence to support a classwide finding of retaliation, the Court specifically found that named Plaintiff Bernardo Perez was the victim of retaliation for the filing of his grievance.

like MAP I, attendance at MAP II is a prerequisite for promotion to ASAC and SAC positions. No reason was offered by the Defendant in support of this inconsistent use of the two MAP programs.

**22.** In Dr. Byham's opinion, a supervisor who is given knowledge of a MAP program's evaluation that an agent is deficient in a certain area will use the data consciously or subconsciously to color their performance evaluations.

Since the date of this Court's findings, the Bureau has appointed a Government employee from outside of the Bureau to head the office of Equal Employment Opportunity within the Bureau. The number of persons who perform EEO investigations have been expanded from 9 to 14.

The Bureau intends to expand training to SAC and field supervisors on the requirements of Title VII of the Civil Rights Act. In this regard, the Bureau intends to specifically address the importance of making training and career development opportunities available to persons in protected classifications.

EEO counselors from each of the field offices will be provided advanced training and these counselors will return to their field offices and provide training to Special Agents and supervisors in the field. The Bureau states that it will undertake to select the most mature, experienced persons to serve as EEO counselors.

Previously, EEO fact finding was performed by inspectors from the inspection staff. The Bureau now assigns inspector aids-in-place to EEO fact finding matters with the intent of providing greater training to a cadre of field office EEO investigators. The persons will have longer tenure on EEO investigatory matters, and can provide greater resources to EEO investigations.

It is the Bureau practice to perform periodic inspections and evaluations of field office operations [23]. Since the date this Court entered its Findings on the liability portion of the trial, the Bureau has revised the inspection procedure for field offices to include an EEO program audit.

Finally, the Bureau has elevated the office of EEO within the Bureau to remove two intermediate steps in the reporting chain between the Bureau EEO Officer and the Director of the Bureau.

The Court is of the opinion that no further improvements to the Bureau EEO system will be Ordered this day. The improvements demonstrate an intensive and systematic effort on the part of the Bureau since the date of this Court's findings on the liability portion of the trial to utilize the EEO program within the Bureau as a tool to detect and eradicate instances of violations of Title VII.

The Plaintiff opposes retaining the selection of EEO counselors in the person of the SAC. The Court is of the opinion that the objection is meritorious. Witnesses for the Defendant who hold management positions within the Bureau emphasized that the EEO counselor must be a person of maturity and judgment. The selection of other supervisory positions, by Order of the Court this day, will be firmly vested in Career Boards; the position of EEO counselor is, in principle, no different. Accordingly, the selection of in-office EEO counselors and inspector aids-in-place will be by application and selection by the Career Board on advice of the EEO Officer, and the field office SAC.

### Appointment to Foreign Legats [24]

The Court received no evidence during the recovery portion of the trial to refute the findings of this Court that,

(1) an Hispanic has not been selected for a position in a non-Spanish speaking nation;

(2) only one South American post where conditions are particularly hazardous is routinely staffed by Hispanics;

(3) Hispanic Special Agents receive far fewer placements than their Anglo counterparts to American embassies in Spanish

---

**23.** This Court, at 707 F.Supp. 891, 924 of its September Memorandum Opinion detailed the inspection of the Puerto Rico field office.

**24.** "Legat" refers to positions at United States embassies in foreign countries. These Special Agent supervisors are appointed at GS 14 level or above and perform Bureau investigative functions in cooperation with local and national law enforcement entities in the host country. It

is a position where competency in the local language is essential to the mission of the Bureau. Plaintiff's contended that Hispanics are under-represented in selection for those offices where their skills would make them particularly effective for the Bureau, and are not at all considered for placement in foreign Legat positions where the local language is a language other than Spanish.

speaking countries, even though they are, as a group, uniquely qualified; and

(4) The Bureau had not articulated a legitimate business reason to justify the past practices.

The Office of Liaison and International Affairs ("OLIA") within the Bureau administers the Legat program. The recommendation of the field office SAC is one way to bring Special Agents to the attention of the Office of Liaison and International Affairs; some agents become candidates through other informal means. After an initial "screening process", the OLIA presents candidates to the Career Board.

The Court, finding that the Bureau has violated Title VII of the Civil Rights Act in failing to promote Hispanics to non-Spanish speaking Foreign Embassies, is of the opinion that injunctive relief is required. Hereafter appointments to Foreign Embassy positions will be by selection of the Career Board. Recommendation of the supervising SAC will not be a condition precedent for application to the program, though the recommendation of the SAC may be weighed by the Career Board together with other factors. It will be within the remedies available to the Panel to recommend promotion to a Foreign Legat position on a strong showing of repeated applications to these positions, and strong qualifications of the Special Agent before the panel.

No target promotion quotas will be Ordered by the Court at this time. The Court feels strongly that undue interference by an Article III Judge which limits the authority of the Executive in an area of foreign relations is not warranted for the reasons set out previously.[25] The injunctive relief Ordered by the Court this day leaves within the discretion of the Director of the Bureau the selection of persons to staff Legat positions at Foreign Embassies. However, to the extent that criteria are established to evaluate persons for promotion to these positions, Title VII requires fairness and avoidance of consideration of impermissible factors in the manner in which persons are selected. It is a delicate balance and the limited injunctive Order of the Court this day is appropriate.

### Performance Appraisal System

The Court found that "(1) Hispanic agents suffer disparate treatment in the conditions of their employment; and (2) those conditions affect their promotional opportunities in an adverse manner."[26] No evidence produced by the Defendant during the second part of the trial controverted the findings of the Court.[27] The Court's findings related to Title III wiretap duty, undercover assignments, other temporary duty assignments, and *ad hoc* investigatory assistance to fellow agents utilizing their linguistic skills. The Court concluded that Title VII prohibits the Bureau

25. "This Court is mindful that portions of the FBI mission, those relating to foreign counterintelligence and staffing of foreign diplomatic posts, encompass activities central to the 'delicate, plenary and exclusive power of the President as sole organ of the federal government in the field of international relations—a power which does not require as a basis for its exercise an act of Congress.' *United States v. Curtiss-Wright Export Co.,* 299 U.S. 304, 320, 57 S.Ct. 216, 221, 81 L.Ed. 255 (1936). Doubtless, the authority of the Director of the FBI to name the persons who serve in foreign posts flows from the Constitutional power of the President in the area of foreign relations. Though the basis for exercising this power does not require an act of Congress, the manner in which the power is exercised can be the subject of judicial review applying Federal Law. Thus, the manner, practice, and procedure by which persons are selected for those positions can reasonably be the subject of this Court's scrutiny. This Court,

finding that a violation of Title VII exists, will seek the assistance of the parties to fashion an appropriate remedy which does not unduly invade the province of the Executive as it seeks to interdict systemic discrimination in the promotional process." Memorandum Opinion on Findings of Fact and Conclusions of Law, Liability Stage, September 30, 1988, 707 F.Supp. 891, 926–27.

26. Memorandum Opinion on Liability, September 30, 1988, 707 F.Supp. 891, 909.

27. Though Defendants demonstrated that *some* non-Hispanic agents have performed similar duty for which they did not receive compensation, Defendants have not demonstrated that this Court erred in finding at the conclusion of the liability portion of the trial that Hispanic agents performed this duty and experienced these conditions in disproportionate amounts.

from failing to adequately credit the contribution of the undercover agent to the mission of the Bureau in terms of promotions and benefits.[28]

Since the date of this Court's opinion, the Bureau has improved the appraisal system governing Special Agents to include foreign language use in performing investigative functions as a critical element for agents who enter with a language skill or foreign language trained agents. Under the new system linguists who have no opportunity to use their language skill in their investigative assignments will not be penalized. Special Agents in Charge will make an appraisal of the effective use of all agents within their office who possess language skills. Upon review of the Bureau performance appraisal system, the Court is of the opinion that no additional changes are required by Title VII or the circumstances of this case in the performance appraisal system.

### Other Relief Relating to Conditions of Employment

The Bureau represents its intention to monitor duty assignments to insure equitable utilization of foreign language skills. Special Agents who are called away from regular duties for temporary duty assignments because of their language skill will report to the Bureau as to the extent their language skills are effectively used. The Bureau has not devised a plan to monitor intra-division assignments to determine whether the burden of temporary duty assignments are distributed in an equitable manner.[29]

The Court found convincing evidence that prior to 1985, Hispanic Special Agents were ordered to submit to testing for Spanish language capability. The Bureau stated that since 1985 and in the future, the testing program will be voluntary.[30] These reforms leave unresolved the issue of whether persons who did not wish to volunteer the use of their language skills because of real or perceived damage to promotional opportunities are entitled to "opt out" of the use of their language skill. The Bureau's position is that Special Agents are required to perform their functions with any or all of their ability and that when an agent's skills are a matter of record, those skills will be used for the good of the Bureau.

The Court specifically refrains from monetarily compensating agents for the effects of disparate conditions of employment for the reasons heretofore given. The promotional opportunities which will be made available through the reforms devised by the Bureau and those Ordered by this Court will provide some indirect relief to agents who were "drafted" into the Bureau

**28.** Memorandum Opinion of September 30, 1988, 707 F.Supp. 891, 911–12.

**29.** Intra-division temporary duty assignments are situations whereby a Special Agent stationed in San Antonio might be directed to the Brownsville resident agency for performance of a wiretap or other assignment. This assignment would require the agent to interrupt his case load, give up priority cases to fellow agents to complete, and would result in no report being made to headquarters which could assess whether the agent was shouldering an inequitable share of onerous duty. However, this agent would be eligible for credit under the FLIP program for some compensation. See discussion of the FLIP program at footnote 30.

**30.** However, Special Agents who wish to benefit from additional compensation provided through the Foreign Language Incentive Program ("FLIP") and the Foreign Language Assessment Program ("FLAP") must submit to testing of their language skill.

These two programs, designated "FLIP" and "FLAP" are an apparent response to the issues raised in this cause. Agents who utilize their language skills in significant amounts will be eligible for increased compensation under the FLIP program. Agents who improve their language proficiency will be eligible for one-time compensation under the FLAP program.

The finding of this Court, that the disparity in conditions of employment experienced by members of the Plaintiff's Class is not amenable to a monetary reward under Title VII, forecloses this Court's detailed review of the FLIP and FLAP programs under TITLE VII. The Court merely observes that FLIP and FLAP are helpful, if sufficiently funded, methods of advancing the FBI's mission. They have the potential of encouraging skilled linguists to enter the Bureau, Special Agents to acquire a proficiency, and linguists to remain in the Bureau. The evidence demonstrated that the bonus compensation available under FLIP for fiscal year 1990 for a qualified Special Agent would be about $1,300.

language use program. The Court cannot undo the effect of the presumption that Hispanics are linguists or the disparate use made of their language skills. A remedy which prevents the Bureau from calling upon the language skill of its agents would overreach the scope and purpose of Title VII and the circumstances of this cause. The violations of Title VII found by this Court relate to the totality of the conditions of employment, and their effect over time on promotional opportunities; not the fact that Hispanic linguists were required to utilize their language skills. Enjoining the Bureau from calling upon the language skill of its agents would unduly intrude on the prerogative of the Director to marshall the resources of the Bureau to perform its mission.

### Statistical Evidence

In the statistical summaries prepared by Defendant's expert to aid the Court in the damages portion of the trial the Court detected flaws in the data base provided to the expert and in the assumptions underlying the models. The Bureau previously did not keep systematic, accurate, or comprehensive records helpful to disprove the findings of disparate conditions of employment experienced by members of the Plaintiff class. The probative weight to be given the Defendant's representation of the frequency of out of the office temporary duty assignments by Hispanic and Non-Hispanic agents is minimal. Dr. Rebecca Klem's statistical summary of Temporary Duty Assignments and Spanish Language usage is based on (1) the Bureau's personnel information numbering system, (2) a competitive promotions data base prepared by Dr. Klem from career board minutes, (3) her interviews of Bureau personnel, and (4) a summary of temporary duty assignments in 1987 and 1988 provided to her by the Bureau.

The Court wholly discounts the probative worth of Defendant's exhibits 659 and 3010. These summaries do not account for the duration of temporary duty assignments or the conditions of their performance. Temporary assignments performed within a field office's geographical area are a material and significant omission from this summary[31]. Further, the evidence demonstrated that there are often "informal" out of the office temporary duty assignments which are not reported to the Bureau division which prepared the summary.[32] The summaries do not reflect joint wire tap assignments with the Drug Enforcement Administration, or state police authorities. Finally, the evidence established that there has heretofore been no rigorous or systematic manner of classifying particular assignments as "Spanish language use assignments."[33] Unrebutted anecdotal testimony demonstrated that members of the Plaintiff's class would be specifically assigned temporary duty assignments for their linguistic skill and then discover that their language abilities were not to be used at all.

Dr. Klem's assertion that temporary duty assignments are borne in a statistically equivalent rate by persons within and without the protected class does not account for Special Agents who perform non-Spanish language TDY's and otherwise carry a full case load.[34] This omission,

---

**31.** Defendant's witnesses could not even agree on a definition of those assignments which are included within the category of TDY's.

**32.** Defendant's exhibit 3015, a summary of 1987 and 1988 temporary duty assignments comparing Spanish related assignments with other kinds of temporary duties demonstrates that there were no undercover assignments in fiscal year 1987; an incredible statistic.

**33.** The omission of competent statistics relating to Spanish language use on *any* investigative function within the Bureau is glaring. As an example, the Government's Exhibit number 3001 details exhaustive compilation of special operations group assignments. The Bureau is capable of keeping track of this resource use but has not done so.

**34.** Defendant produced a pilot Special Agent to testify as to the intense danger experienced by TDY's and the frequent number of these—all without extra compensation. However, on cross-examination, it was revealed that this agent specifically volunteered for this duty, can opt out at any time, carries no additional case load, and experiences significant "down time" when not flying a plane.

added to the flaws in the underlying data, destroy the credible worth of the comparison for any other purpose than the illustration that the work of the Bureau requires great flexibility in the assignment of persons to matters outside of their investigative case load. Further, there exists no formula by which to provide monetary compensation when the disparate conditions of employment fall disproportionately on a protected group. Individual review of the effects of these conditions on promotional opportunities of classmember special agents who have one year of experience or more at the GS13 level is unavoidable and appropriate [35].

Expert Klem's testimony ably demonstrated that no statistical summary could account for, or determine, a monetary remedy for the discriminatory conditions and effects on agent's promotional opportunities found by this Court in its September 30 memorandum opinion. Plaintiff recommended a compensation scheme which would determine the average value for a year of service in the Bureau. Hispanic classmembers who fell below the average value would be awarded the differential for each of the relevant years. Dr. Klem's statistical summary demonstrated that as many or more classmembers earned more than the average for a Bureau year in service. Accordingly, as a group Dr. Klem's summary indicated that Hispanics are not paid significantly less than their counterparts.

Dr. Klem's study went on to assert that Hispanics, on average, apply to the same number of positions as Non–Hispanics with about the same success rate. Dr. Klem then concluded that Hispanics have unrealistic expectations for advancement within the Bureau. This is a monumental leap in reasoning. Dr. Klem's conclusion did not account for the findings of this Court that:

(1) Hispanics have been discouraged from applying for positions, (2) heretofore the promotional system has not fully documented the actual applicant pool, (3) the contribution of Hispanics to the Bureau has not been reflected in the agent's administrative profile, and (4) Hispanic Special Agents have been prevented from training and experience opportunities which better prepare them for advancement.

Data available to the Government's experts were not incorporated into the model. Performance ratings and MAP records were not incorporated. No attempt was made to incorporate the disparate conditions of employment found by this Court into the study. No effort was made to incorporate the differences in opportunities to acquire broad professional experience and training into the model. The omissions from Dr. Klem's model require this Court to discount Dr. Klem's data base as well as her conclusion that Hispanics have unrealistic expectations for advancement.

The LaFree analysis [36] would establish a floor for Hispanic agents; persons who fall below the average value of a year in service throughout the Bureau would be compensated up to the level of the average. However, Title VII does not entitle members of a protected class at the minimum to be compensated at the mean or the median for compensation of non-protected persons. This type of formula relief is not required, nor is it appropriate to the findings of liability in this cause.[37]

Dr. Klem's analysis purported to demonstrate the inappropriateness of Plaintiff's suggested formula to compensate Plaintiff's class, and was offered in rebuttal to this Court's findings of discrimination in conditions of employment and promotional opportunities. A statistical summary which takes as a starting point that conditions of employment, contributions to the

The Section Chief of the Criminal Investigation Support Section testified that neither pilots nor other Special Operation Group agents maintain a regular case load.

**35.** See appendix and supra, page 1420 et seq. Only persons of GS 13 rank and above will be reviewed by the Panel.

**36.** Prepared by Dr. Gary D. La Free, Ph.D Indiana University of Indiana, 1979.

**37.** The Court does not comment on whether this type of formula relief may be an appropriate remedy under Title VII under different circumstances.

mission of the FBI, and career advancement opportunities are identical for the relevant group can be a powerful explanatory tool under the findings of this Court. The Court was unpersuaded by such testimony.

### Class Representative Bernardo Perez

Defendants produced witnesses who testified that Perez is eligible for promotion but has not been considered for promotion in grade or placement in a field office as SAC. The Court found previously that the articulated reasons given to justify adverse employment decisions were a pretext for retaliation against Perez for protected EEO activity. The Court further found that there was a causal relationship between the protected activity and adverse employment decisions. Later, the Court found that the Bureau secured a Grand Jury subpoena and used the subpoenaed materials in the course of an administrative investigation of Perez without leave of Court.

A finding of retaliation is compensable under Section 706(g) of Title VII (42 U.S.C. Sec. 2000e–3(a), 2000e–5(g). Accordingly, permissible relief includes back pay, front pay, remedial seniority, injunctions and declaratory relief. The Record establishes that Bernardo Perez was compensated at the rate of a GS 16 employee at all relevant times in this litigation; the maximum pay level available to government employees in the GS system. Promotion to the GS 17 or GS 18 level at the times of the retaliatory acts would not have provided him with any greater salary.

An appropriate remedy for Bernardo Perez is to be found in an Order of non-monetary relief. Perez served at the level of SAC in San Juan and was demoted to the position of ASAC in Los Angeles. In Los Angeles he was prevented from doing the job to which he was assigned for discriminatory reasons and later, in retaliation for protected activity. His transfer to El Paso was causally related to ongoing retaliation by supervisors within the Bureau.

Perez requests compensation for mental anguish, and damages related to his transfer from San Juan. These items of damages are outside of the purview of the Federal Statutes under which this cause was filed and accordingly can not be awarded by the Court in this matter.[38]

However, the remedy of 'rightful place seniority' is appropriate. The Court is of the opinion that at the earliest opportunity, the Bureau should make available to Perez responsibilities commensurate with his experience and training, with the presumption that from the time Perez served in San Juan to the present date, his performance evaluations have been infused with the retaliatory animosity found by this Court. Where Perez was censured by the Bureau for his participation in EEO grievances or this civil litigation, the Bureau is directed to consider Perez's conduct as fully justified under the circumstances and for the betterment of the Bureau. Within 45 days of the date of this Order, Perez shall be promoted to the rank of GS 17 with the related compensation and privileges which attend that rank. The Director is requested to report to this Court at 90 day intervals promotional decisions related to Bernardo Perez until such time as Perez is promoted to SAC or similar position of responsibility.

### Conclusion

Members of the Plaintiff's class at lower rank will benefit from the institutional reforms made by the Bureau in response to this Court's findings, and the additional reforms required by this Court this day. Indirectly, the Plaintiff class is rewarded by an award of costs and attorney fees for prevailing in their suit. The Court opines hopefully that the conditions of employment and promotional opportunities for members of the Plaintiff class will tangibly improve because of the reforms devised by the Bureau and Ordered this day.

The Bureau has taken significant steps since the date of trial to correct the disparate conditions of employment. Whereas non-Hispanic linguists were permitted to "opt out" of language related duty assign-

---

**38.** See discussion, supra, page 1419.

ments, the Bureau represents that Hispanics and non-Hispanics will be henceforth treated alike. Mechanisms are in place to strictly monitor and control the number of temporary assignments within and without of the office which interrupt an agent's case work so that Hispanics do not bear an unfair burden and when they do so, their efforts will bear weight in the valuative and promotional processes. These and other reforms demonstrate energetic and good faith effort to correct the disparities found by this Court in the liability portion of the trial.

Nonetheless, members of the Plaintiff class have experienced significant—if not easily measured—effects of discrimination in their career advancement. The promotional system remains unsystematic, excessively subjective, and incapable of review of specific promotional decisions. The reforms required by the Court are designed to remove hidden barriers and allow all Special Agents to have access to the promotional opportunities which their capabilities and experiences qualify them.

The Judgment this Court enters by separate Order this day should be considered final for all purposes related to the findings of liability for violations of Title VII, institutional reforms, denial of class-wide monetary compensation, and specific relief afforded Bernardo Perez. Should any party wish to appeal the Court's appointment of the Panel for determination of 'rightful place seniority' for a portion of the Plaintiff's class, the Court would entertain a Motion for expedited interlocutory appeal on these matters. The Court does not intend to stay the implementation of the Panel review procedure pending appeal of this Court's findings without Order of an Appellate Court, Rule 8, Federal Rules of Appellate Procedure.

The Court will list below each of the Orders discussed herein:

1. No award of back pay or determination of promotional quotas for members of the Plaintiff class will be made.

2. No Classwide award of seniority will be made.

3. Individual hearings performed by a three member Special Master Panel for the sole remedy of 'rightful place seniority' for individual members of Plaintiff Class who occupy the rank of GS 13 and above on this date will be convened within 60 days of this Date.

4. No special compensation for extra duty will be awarded.

5. Henceforth, career board meetings at every level within the Bureau will be recorded for review.

6. No person will be promoted to the rank of GS 14 or above who has not been considered as part of an applicant pool before the Career Board.

7. Career Board records will be available to the EEO Office, the Office of Personnel Resources within the Bureau, and the Director of the Bureau. Applicants may be given access to Career Board Records in a manner within the discretion of the Director.

8. No undocumented, informal recommendation to the Career Board on persons or positions in the Bureau will be made.

9. SAC's will not be permitted to select a person for promotion other than the person chosen by the Career Board.

10. The Plaintiff's request to put the FBI EEO Officer on Career Boards is Denied.

11. Plaintiff's request for systematic interviewing of candidates for promotion by the Career Board is Denied.

12. Plaintiff's request of this Court for injunctive relief relative to the Bureau performance evaluation system is Denied.

13. The Bureau is directed to commission a study of whether shifting program priorities since 1975 require changes in the valuative dimensions of the MAP program. A report is to be made to the Director within 12 months of this day and a copy filed with this Court.

14. The Bureau is enjoined from distributing the results of its MAP assessment to supervisors of Special Agents unless MAP is made a significant and material basis of the promotional system.

15. The Bureau is directed to monitor the selection of persons for attendance at MAP to provide equitable access to MAP by Hispanic Special Agents.

16. The selection of EEO counselors shall be removed from the authority of the SAC and placed within the authority of Career Boards.

17. Recommendation of a SAC will not be a condition precedent for application to a LEGAT position.

18. Appointment to Foreign Embassy positions will be by selection of a Career Board.

19. Plaintiff's request to enjoin the Bureau from calling upon the language skill of its agents is Denied.

20. No award of monetary compensation will be given to named Plaintiff Bernardo Perez relating to the retaliation found by this Court.

21. Within 45 days of this Order, the Bureau is directed to promote Perez to the rank of GS 17 with the related compensation and privileges attendant to that rank. The duty assignment of Perez shall be within the discretion of the Director. A separate Judgment awarding attorney's fees and appropriate costs will be entered shortly hereafter. All other relief requested by either Plaintiff or Defendant is Denied.

## JUDGMENT

BEFORE THIS COURT came on for trial the Plaintiff class consisting of present or one-time Special Agents of the Federal Bureau of Investigation, alleging that the FBI violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e–2 discriminating against Hispanic agents on the basis of their National Origin.

On Motion of the parties, the litigation was bifurcated into a "liability" stage to determine whether the Defendant violated Title VII and a "recovery" stage to determine appropriate remedies under Title VII of the Civil Rights Act. By separate Memorandum Opinion entered this day, the Court made findings relevant to the recovery portion of the trial, Ordered certain institutional reforms, appointed a Panel of Special Masters for the purpose of reviewing the entitlement of a portion of the Plaintiff class to "rightful place seniority", and fashioned an award to redress the retaliation experienced by named Plaintiff Bernardo M. Perez.

Plaintiff class has prevailed on a significant portion of their claim of discriminatory treatment in violation of Title VII of the Civil Rights Act. Each of the Orders made in the Court's May 5, 1989 Memorandum Opinion on Findings of Fact and Conclusions of Law, Bifurcated Trial: Damages Stage are deemed to be incorporated into this Judgment. The Court, by subsequent memorandum opinion, will determine the amount of attorney's fees to be awarded to the Plaintiffs.

IT IS ORDERED, ADJUDGED AND DECREED that Judgment is awarded to Plaintiffs in the above-numbered cause. Costs of Court shall be assessed against the Defendants. Defendants shall pay the attorney's fees of the Plaintiffs in the amount determined by this Court. The Court has made no other monetary award to the Plaintiff class and none will be forthcoming.

## APPENDIX

The Court, by memorandum opinion entered this day, appointed a three-person Special Master Panel to review individual classmembers' contentions that they were the victims of discrimination in their promotional opportunities.

1. Class members shall be delivered a copy of this Court's opinion by the Clerk of the Court of the Western District of Texas by mailing a copy to the last known address or duty station of the classmember.

2. Within 20 days from the date of receipt of this opinion, classmembers who attained GS 13 level on or before May 5, 1989 should state by letter to the Clerk of the Court, U.S. Courthouse, 511 E. San Antonio, El Paso, Texas 79901, whether (s)he seeks the remedy of rightful place seniority.

3. Within 15 days from the date a class-member gives notice to the Clerk of the Court that (s)he seeks the remedy of rightful place seniority, the classmember should submit by written statement the basis for the claim and the applicability of the Findings of this Court to the employment history of the classmember. At the same time, the classmember may submit, in addition to a signed statement, any other documentary evidence or affidavits available to the classmember in support of the claim.

4. Within 30 days from the date Defendant receives a copy of the classmember's written statement setting forth the basis for the rightful place seniority claim, the Defendant shall respond by stating those factual elements of the classmembers' claim which it contests. If no factual statements of the classmember are in dispute, the Defendant, within 30 days from the date Defendant receives a copy of the classmember's written statement, may make arguments in written form as to the entitlement of the classmember to promotion.

5. For good cause, the Panel, acting through a Special Master, may extend the Defendant's response deadline to provide opportunity for the Defendant to prepare a response.

### Remedies Available to the Panel of Special Masters

1. The Special Master Panel, hereinafter called "Panel," may recommend promotion to a higher grade and position. No other remedy will be within the purview of the Panel. The recommendation may state; "Special Agent __(name)__ demonstrated that (s)he is the victim of disparate conditions of employment and that these conditions have prevented such agent from promotional opportunities to the grade level of GS____. Accordingly, we find that this Special Agent should be promoted to any position (or to a specific position to which (s)he is particularly well suited) at grade level GS____." In support of the recom-

mendation, the Panel will set out a short statement of findings in support of the recommendation.

2. A recommendation for promotion by the Panel will result in a pay increase to the Special Agent commensurate with the promoted position on or before the 45th day following the entry of the recommendation with the Clerk of the Court, El Paso Division.

3. Such recommendation will be filed with the Clerk of this Court with a copy to be forwarded to the Special Agent and the Personnel Officer of the Bureau.

### Appeal from the Recommendation of The Special Master Panel by the Classmember

1. A finding of the Panel that the classmember is not recommended for promotion at the time of the hearing is appealable by the Special Agent to United States Magistrate Janet Ruesch, Western District of Texas, El Paso Division.

2. The Record on appeal shall include a transcript of the proceedings and documents before the Panel at the time of their decision. The Record will be sent to the Magistrate for her review.

### Recommendation to the Director

1. The Director of the FBI or his designated representative may accept or reject the recommendation of the Panel within 20 days. Acceptance of the recommendation will end the review process. The Director may implement the recommendation according to the needs of the Bureau. The Director of the FBI is not required to replace any Bureau supervisor with a classmember. The Court will set no time limit within which the Bureau must give supervisory responsibilities to a Special Agent. These matters are left to the discretion of the Director of the FBI.

2. Within 20 days of receipt of the recommendation, the Director may appeal the

recommendation to the Magistrate, by notification by certified mail, to the Clerk of the Court, El Paso Division, and to the classmember. No evidence other than the evidence before the Panel will be considered by the Magistrate sitting in review of the findings of the Panel. The Director and the classmember may submit memoranda in support of their positions within 20 days of the date of notification of appeal to the Magistrate.

### Appeal to the Magistrate

1. The Magistrate, sitting in review, may overturn, affirm, or remand the recommendation of the Panel. Remand for further fact finding will be Ordered in only rare instances. Except for the prohibition regarding the receipt of additional evidence, the Magistrate will review the evidence *de novo*.

2. Either the Special Agent or the Director of the Bureau may appeal the finding of the Magistrate to this Court.

3. The finding of this Court affirming or reversing the decision of the Magistrate will be the event which triggers appeal to the Fifth Circuit Court of Appeals, pursuant to Rule 4, Federal Rules of Appellate Procedure.

### Procedure Governing Proceedings Before the Panel

1. Upon review of the statement of the classmember and the response of the Defendant, the Panel, within its discretion may determine that a hearing is not required and may make a recommendation based on the written submission.

2. The proceedings of the Panel will be recorded with transcript made in the event of an appeal.

3. The proceedings are non-adversarial. Questioning of witnesses will be performed by Panel Members only. No legal counsel will be provided Special Agent class members. A representative of the Defendant may be present to make a statement, submit documentary evidence, bring to the attention of the Special Master Panel the identity of persons who are available to provide evidence relevant to the classmember's request, or suggest additional areas of inquiry to the Panel.

4. Panel proceedings will not be advertised or open to the public. Proceedings, to the greatest extent possible, should be convened at the field office location of the classmember.

5. Only those conditions of employment and promotional opportunities which were the basis of this Court's Findings will be relevant before the Panel. The issues before the Panel are: (1) has the classmember experienced to a significant degree the weight of the disparate conditions of employment? (2) Have these conditions been the cause of failure to advance in the Bureau? (3) Have the agent's contributions been undervalued by the Bureau?

6. Within 10 days from the date of a classmember's hearing, the Defendant may submit to the Panel relevant evidence which responds to the claims of the classmember by memorandum letter, affidavits, or other documentary evidence.

7. The burden of persuasion on classmember's claims shall be by the preponderance of the evidence. To be considered for 'rightful place seniority' relief, a classmember should appear before the Panel, state in writing or in person that (s)he has been the victim of disparate conditions of employment and promotional opportunities, and state orally or in writing the factual reasons in support of the request.

8. The Panel may, at its discretion, convene hearings with one, two, or three of the members of the Special Master Panel present. When fewer than three Special Masters convene a hearing, the Special Master(s) not present may concur or disagree in the finding of the other upon review of the Record.

9. The recommendation of the Panel requires the concurrence of at least two of the Special Masters.

### Ministerial Matters

1. The Defendant will provide an assistant to the Panel to perform ministerial support functions including assembling documents, arranging for the security of classified materials, and coordinating schedules of persons appearing before the panel.

2. The Defendants may have any persons present at the hearing for the purpose of representing the interests of the Government.

3. Necessary security clearances will be performed at the earliest date for those persons named Special Master.

4. Any party making any submission to the Panel must file three copies of the submission with the Clerk of the Court, El Paso Division, with the name of the class-member and the style of this case prominently displayed. No other formal requirements shall govern the submission of materials to the Panel. The Clerk of the Court shall provide one filemarked copy of the submission to the Defendant by mail to Defendant's counsel at the Justice Department or the person designated by the Defendant to receive submissions related to Special Master Proceedings, and one copy to the Panel.

5. The costs incurred by the Panel shall be reimbursed. Special Masters shall be compensated at the rate of $100 per hour. Costs are taxable to the Defendant as Costs of Court.

### Appointment of Special Masters

These persons are appointed to serve as Special Masters of the Court in this matter:

1. Ms. Susan Getzendanner, former United States District Court Judge for the Northern District of Illinois, 1980–1987; member, Illinois Bar, Seventh Circuit and American Bar Associations; Director, Chicago Legal Club.

2. Mr. W. Edwin Youngblood, member of the State Bar of Texas, Federal Bar Association and the American Arbitration Association; former Administrative Law Judge, Regional Attorney, and Regional Director of the National Labor Relations Board; Professor at Stephen F. Austin State University, the University of North Texas and Southwest Texas State University.

3. Mr. William Ng, Deputy General Counsel to the Equal Employment Opportunity Commission.

### Revision of Panel Procedure

At any time, the Panel, by request to this Court, may suggest amendments to these procedures which will improve the efficiency or advance the purposes of the Court's Findings.